J. B. ELKINS

v.

**Laura Stell TOWNSEND et al.**

Civ. A. No. 6380.

United States District Court
W. D. Louisiana,
Shreveport Division.

April 7, 1960.

Roy M. Fish, Springhill, La., for plaintiff.

John T. Campbell, Charles A. Marvin, Campbell, Campbell & Marvin, Minden, La., for defendants.

BEN C. DAWKINS, Jr., Chief Judge.

### Statement of the Case

At issue here is the ownership of an undivided one-fourth interest in the oil, gas and other minerals underlying the following described lands:

Northwest Quarter (NW¼) of Section 8, Township 23 North, Range 9 West, and the North Half of North Half of Northwest Quarter of Northeast Quarter (N½ of N½ of NW¼ of NE¼) of Section 8, Township 23 North, Range 9 West, LESS approximately five (5) acres, described as that part of the North Half of North Half of Northwest Quarter of Northeast Quarter (N½ of N½ of NW¼ of NE¼), Section 8, Township 23 North, Range 9 West, lying East of the main public road leading from Minden, Louisiana, to Magnolia, Arkansas, being in all 165 acres, more or less, situated in Webster Parish, Louisiana.

Incidental to the principal issue is the ownership of royalties, aggregating several thousand dollars, which are being held in suspense to the credit of this interest by Placid Oil Company, the purchaser of the petroleum products produced by the Carter Oil Company, the common lessee of both plaintiff and defendants.

The suit was filed in the State Court and timely removed here by defendants, on grounds of diversity of citizenship. It was brought by J. B. Elkins, a citizen of Louisiana, against Mrs. Laura Stell Townsend, and her children, Arthur G. Stell, Jr., and Mrs. Lucy Ann Stell Polter, all citizens of Texas. It arose in the following manner:

Prior to May 16, 1938, two brothers, W. G. Stell, a single man, and John T. Stell, husband of Nancy Stell, owned the above described lands in indivision and in equal proportions. On that date W. G. Stell sold to Arthur G. Stell, husband of Laura Stell, who was the only living child of John T. Stell, an undivided one-fourth interest in the minerals underlying the subject lands.

On July 30, 1939, Arthur G. Stell died intestate, being survived by his widow (now Mrs. Laura Stell Townsend), and two minor children, Arthur G. Stell, Jr., born on January 2, 1930, and Lucy Ann Stell (now Mrs. Polter), born on June 11, 1934.

Following his death, Mrs. Laura Stell Townsend was regularly appointed as guardian for her two minor children by the Probate Court of San Patricio County, Texas, where they were domiciled; and by appropriate ancillary proceedings, later held in Webster Parish, Louisiana, her appointment as such was recognized and confirmed by the Louisiana Court on January 14, 1943.

John T. Stell died on May 7, 1946, being survived only by his widow, Mrs. Nancy C. Stell, and his two minor grandchildren, Lucy Ann and Arthur G. Stell, Jr., who were his sole heirs at law. John T. Stell, who at the time of his death was a resident of Palo Pinto County, Texas, left a last will and testament, dated February 23, 1942, by which he bequeathed all of his property to his widow. This will was duly probated at his domicile in Texas.

Later, on September 3, 1946, Mrs. Nancy Stell, being advised that the bequest of *all* of her husband's Louisiana property to her encroached upon the legitime (LSA–Civil Code Article 1493) of the surviving forced heirs of the deceased— his two grandchildren—executed an authentic act of renunciation, specifically renouncing the bequest in her favor to the extent that it impinged upon their legitime; i. e., she renounced all of the bequest in her favor in excess of two-thirds of her husband's one-fourth community interest in the subject lands. This act of renunciation, together with a certified copy of the will, was duly recorded in Webster Parish, Louisiana.

Thus, as a result of the acquisitions, inheritances and renunciation above set forth, the ownership of the property here involved, on November 6th, 1946, was as follows:

#### Surface Ownership

W. G. Stell .................... ½

Mrs. John T. (Nancy) Stell, (½ of ½ or ¼ as community; ⅔rds of ¼th by last will and testament of John T. Stell, total) .. 5⁄12ths

Lucy Ann and A. G. Stell, Jr., (⅓rd legitime of ¼th, or) .... 1⁄12th

#### Mineral Ownership

W. G. Stell .................... ¼th

Mrs. John T. (Nancy) Stell, (as above) .................... 5⁄12ths

Mrs. Laura Stell Townsend, widow of A. G. Stell, Sr., (community ½ of ¼th mineral interest purchased by her husband from W. G. Stell on May 16, 1938) ...... ⅛th

Lucy Ann and A. G. Stell, Jr. (½ of ¼th from father's succession; plus ⅓rd legitime of ¼th from grandfather's succession (⅛th plus 1⁄12th), total) ........... 5⁄24ths

Shortly after the death of John T. Stell, negotiations developed for the sale of the subject property, which finally ripened into an agreement whereby the above listed owners of the property (both of the land and minerals) agreed to sell it to J. B. Elkins, plaintiff here, on the condition that the owners (vendors) might reserve to themselves (1) three-fourths of the oil, gas and other minerals underlying the property, and (2) all future rentals which might be paid under an oil and gas lease to which the lands were then subject, it being understood by all parties that Elkins was to receive the land and one-fourth of the minerals under the property.

The late Judge R. D. Watkins, a practicing attorney and City Judge in Minden, Louisiana, had represented Mrs. Laura Stell Townsend in having her qualified as guardian for her children. He likewise had prepared the act of renunciation on behalf of Mrs. Nancy Stell, and was also the attorney for Mr. Elkins, the prospective purchaser. He was contacted by the parties, employed

by Elkins to examine the title to the property, and to see that the transfer was legally accomplished, and was employed on behalf of the Stells to prepare all legal proceedings and the deed necessary to carry out their agreement.

While Judge Watkins is now deceased, his file was produced in evidence, and the very first entry therein (undoubtedly made when he was first acquainted with the agreement) declares his understanding of the agreement of the parties thus:

"¾ int to be reserved in minerals by Stells
Stells to get present lease rentals. other words

 all J. B. Elkins
 gets ¼
———————————————— Stells ¾
taxes prorated as of sale."

In consummation of the agreement, Judge Watkins then prepared in sequence:

(1) A petition on behalf of Mrs. Townsend for the appointment of an under-tutor for her minor children, pursuant to which Ardis C. Burns was so appointed, took the required oath, and letters fiduciary issued to him on September 28, 1946.

(2) A petition on behalf of Mrs. Townsend, as foreign guardian for her children, in which was outlined the offer of Elkins, and seeking the necessary authority on behalf of her children to accept the same.

After averring that the property was owned by the below-listed persons and in the following proportions:

| Owners | Surface | Minerals |
|---|---|---|
| W. Garland Stell | ½ | ¼ |
| Mrs. Nancy Stell | 5/12 | 5/12 |
| Mrs. Laura Stell Townsend | (None) | ⅛ |
| Garland Stell and Lucy Ann Stell (jointly) | 1/12 | 5/24 |

the petition then alleged:

"That one J. B. Elkins, a resident of Webster Parish, Louisiana, has offered to purchase the above described property in fee, subject to existing oil and gas mineral leases, for the sum and price of Four Thousand One Hundred Twenty-five and No/100 ($4,125.00) Dollars in hand, or $343.75 for the interest belonging to the said minors, with a reservation to the vendors of an undivided three-fourths (¾) of the oil, gas and other minerals * * *.

"That a further stipulation in favor of the vendors is that they will continue to receive any and all delay rentals to be paid under existing oil, gas and mineral leases, which in the case of the said minors is that certain oil, gas and mineral lease executed on the 14th day of January, 1943, in favor of J. Ray Murray, which said lease is recorded in the Conveyance Records of Webster Parish, Louisiana, Book 158 at page 356, and which lease is still in effect and is hereby ratified by petitioner, the allegations of this and the preceding article being more fully shown by reference to the unexecuted carbon copy of a cash deed which is annexed hereto and made a part hereof to show the terms and conditions of the proposed sale."

The under-tutor concurred in Mrs. Townsend's recommendations, and pursuant to that petition, on October 9, 1946, the Court authorized the guardian to sell the minors' interest in the property for the sum of $343.75,

"reserving from the sale to the said minors 5/32nds of the oil, gas and other minerals in, under and that may be produced from said described land, etc."

Following the issuance of that order, there was then prepared by Judge Watkins, and executed by all of the owners of the lands and minerals, the deed out of which this controversy has arisen. It was dated November 6th, 1946.

Pertinent portions of that deed read as follows:

"Be it Known, That this day before me, the undersigned authority, a Notary Public in and for the said Parish, duly commissioned and sworn, came and appeared W. Garland Stell, a single man, resident of Cuba, New Mexico; Mrs. Nancy C. Stell, widow of John T. Stell, deceased, resident of Mineral Wells, Texas; Mrs. Laura Stell Townsend, wife of W. M. Townsend, resident of Fort Worth, Texas, appearing herein individually and as foreign guardian for her minor children, Garland Stell and Lucy Ann Stell, duly authorized to act herein for said minors by judgment of the 26th Judicial District Court in and for Webster Parish, Louisiana, who declared that they do by these presents Grant, Bargain, Sell, Convey and Deliver, with full guarantee of title, and with complete transfer and subrogation of all rights and actions of warranty against all former proprietors of the property herein conveyed, together with all rights of prescription, whether acquisitive or liberative, to which said vendor may be entitled, unto J. B. Elkins, husband of Ruth L. Pittman, resident of Webster Parish, Louisiana, the following described property, to-wit:

\* \* \* \* \* \*

[Description]

\* \* \* \* \* \*

"specifically reserving, however, to the vendors herein all delay rentals due or that may become due under existing oil, gas and mineral leases covering said property and further reserving three-fourths (¾) of the oil, gas and other minerals in, on, under or that may be produced from said land, it being understood and agreed that the one-fourth (¼) mineral interest conveyed hereby is conveyed by each vendor in the proportion his or her mineral interest bears to the whole, the share to be conveyed by each vendor being set out as follows:

W. Garland Stell ......... ¹⁄₁₆
Mrs. Nancy C. Stell ...... ⁵⁄₄₈
Mrs. Laura Stell Townsend . ¹⁄₃₂
Garland Stell and Lucy
 Ann Stell (jointly) ...... ⁵⁄₉₆

"To have and to Hold said described property unto said purchaser, his heirs and assigns forever.

"This sale is made for the consideration of the sum of Four Thousand One Hundred Twenty-five and No/100 ($4,125.00) Dollars cash in hand paid, the receipt of which is hereby acknowledged.

"It being understood and agreed by the parties hereto that the two minors, Garland Stell and Lucy Ann Stell, are receiving the sum of $343.-75 together for the undivided ½ interest in the fee title owned jointly by them."

The price paid by Elkins for the property was $4,125.00, paid by his checks issued, payable and for the purposes as follows:

(1) Check to W. G. Stell for $1,-987.85 (being $2,062.50 as his part of the purchase price, less $74.65 for ½ costs, attorney's fees and taxes).

(2) Check to Mrs. Nancy Stell for $1,644.10 (being $1,718.75 as her part of the purchase price, less $74.-65 for ½ costs, attorney's fees and taxes).

(3) Check to Mrs. Laura Stell Townsend, as foreign guardian for the minors, Garland Stell and Lucy Ann Stell for $343.75 (this being the minors' part of the purchase price as set forth in the Court's authorization, without contribution by the minors toward costs, attorney's fees and taxes).

(4) Check to R. D. Watkins for $149.31 (this being attorney's fee, $100.00; taxes, $44.91; and revenue stamps, $4.40).

It is highly significant, as will be hereafter pointed out, that one of the vendors, Mrs. Laura Stell Townsend, received no part of the purchase money, and her

children were paid only for their "fee" title, receiving nothing for their mineral interest.

Presented for decision in this case is the effect to be given to the mineral reservation contained in the foregoing deed dated November 6, 1946, because prior to the expiration of ten years (the period of liberative prescription established by Louisiana's laws for the extinction of mineral servitudes) from the date thereof and beginning on February 10, 1956, several producing oil wells were drilled on the property, under leases executed by plaintiff, defendants and others in 1953. This drilling activity would have interrupted the current of prescription then running against the mineral rights claimed here by defendants, if they were still in existence.

## The Issues

Plaintiff contends that the mineral servitude, covering an undivided one-fourth interest in the minerals, granted by W. G. Stell to Arthur G. Stell on May 16, 1938, was not renounced, expressly or tacitly, by the deed of November 6, 1946; that this mineral interest accordingly continued in force and prescribed for non-user on May 16, 1948, when it reverted to him as the then owner of the land. In support of this position, he further contends that the correct and proper interpretation to be placed on the deed of November 6, 1946, is that therein (1) *each* vendor reserved for himself or herself three-fourths of such minerals as he owned before the conveyance, and *each* vendor conveyed one-fourth of such minerals as were previously owned by him; (2) that the reservation to the vendors of three-fourths of the minerals underlying the property was insufficient to create a new servitude to that extent because of the continued existence of the 1938 servitude; and (3) that even if such were the intent of the parties, it was legally impossible of accomplishment on the authority of Long-Bell Petroleum Company v. Tritico, 1949, 216 La. 426, 43 So.2d 782.

Defendants, on the other hand, contend (1) that the reservation to *"the vendors"* of three-fourths of the minerals, having been established as the result of the joint action of *all* the vendors (who together owned *all* the lands and *all* the minerals thereunder) was in all respects sufficient to, and in fact did, create a new servitude; (2) that it was so intended and understood by all the parties when the sale was made; (3) that the primary object intended to be accomplished by the joint execution by all the land and mineral owners of the deed containing the reservation was to so merge all their prior separately owned interests in the property into a single unit, so that the vendee could validly and effectively acquire the lands and one-fourth of the minerals thereunder, and so that the vendors could validly and effectively reserve to themselves, jointly, three-fourths of the minerals thereunder, which rights so reserved should extend for at least ten years subsequent to the date of the deed; (4) that unless the reservation is contrary to law, it is the duty of the Court to interpret and enforce it in accordance with their intentions; (5) that said reservation is not contrary to law, nor was it legally impossible, on the authority of Tritico, as claimed by plaintiff; (6) that when the deed here involved was executed, the landowners owned three-fourths of the minerals which were wholly unaffected by any prior servitude, and two of the landowners (the Stell minors), owned one-half of the one-fourth mineral interest acquired by their father in 1938. Such being true, the landowners could effectively reserve three-fourths of the minerals underlying the property, and this was what was done, and intended to be done; (7) that by the joinder of Mrs. Townsend and her children with the remaining landowners in conveying to Elkins the lands and one-fourth of the mineral rights thereunder with warranty of title, the servitude established in 1938 was effectively terminated by at least a tacit renunciation, so that Elkins could, and did, acquire the property burdened

with no servitudes other than the one created in the 1946 deed; (8) that if the deed of 1946 should be held insufficient to establish or create a single, new, right, and if it should be further held that the 1938 servitude continued to exist after the execution of the 1946 deed, then the reservation in the 1946 deed was a sufficient acknowledgment of the old servitude to interrupt the prescription then running, and cause it to commence running anew.

■ We agree with defendants' position on all points except the last.

## Discussion

In discussing and resolving the legal issues which this case presents, we think that the logical approach is to consider the following questions:

1. Did the landowners and mineral owners, by their act of joining together in selling the land and one-fourth of the minerals to Elkins, while reserving to themselves collectively three-fourths of the minerals thereunder, intend by their reservation to establish a new servitude?

2. Was the language in which the reservation was couched sufficient to create a new right in the nature of a servitude?

3. Assuming that they so intended, was the creation of such a servitude impossible, either because of a prohibition of the Louisiana laws, or for other reasons?

4. What effect shall be given to the 1946 deed as to the servitude established in 1938?

(a) Was a tacit renunciation of that servitude thereby effected?

(b) If not, was the prescription then running against it interrupted?

Proper resolution of these questions requires, of course, interpretation by the Court of the text of the contract (deed).

■ In the interpretation of such contracts, it is the duty of the Court to ascertain the intention of the parties; and, unless prohibited by law, impossible of execution, or contrary to public policy,[1] to enforce it according to such intent.

■ It is further the duty of the Court to ascertain such intent from the language of the instrument itself, without resort to extrinsic evidence, if its meaning is plain and unambiguous; but if it is ambiguous, or subject to more than one interpretation, then extrinsic evidence, dehors the instrument, may and should be resorted to in order to determine its meaning.[2]

---

1. LSA–Civil Code Article 1764:
 "All things that are not forbidden by law, may legally become the subject of, or the motive for contracts."

2. LSA–Civil Code Articles 1945, 1946, 1950, 1956:
 "Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:
 "First—That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made;
 "Second—That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;
 "Third—That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;

"Fourth—That it is the common intent of the parties—that is, the intention of all—that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract." Article 1945.
"The words of a contract are to be understood, like those of a law, in the common and usual signification, without attending so much to grammatical rules, as to general and popular use." Article 1946.
"When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms." Article 1950.
"When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation." Article 1956.

Such are the provisions of the Civil Code of Louisiana, and such are the adjudicated decisions of the appellate Courts of Louisiana. In the landmark case of Vincent v. Bullock, 1939, 192 La. 1, 187 So. 35, is found an application of these principles. Said the Court:

"In reaching this conclusion we think the trial judge failed to give consideration to the fundamental principle that legal agreements have the effect of law upon those who form them and that 'none but the parties can abrogate or modify them' (Article 1945, Revised Civil Code), as well as the corollary rules for the interpretation and construction of contracts as laid down in Section 5 of Chapter 3 of Title 4, article 1945 et seq., of the Revised Civil Code, under the heading 'Of The Interpretation Of Agreements,' and the provisions of Article 1764 of the Revised Civil Code under the title dealing with the general provisions of conventional obligatons, which provide that 'All things that are not forbidden by law, may legally become the subject of, or the motive for contracts * * *,' and also in connection therewith ' * * * the third branch of the first division of obligations of this chapter * * * called real obligations'. Article 2010.

"The Revised Civil Code further provides 'That courts are bound to give legal effect to all such contracts according to the true intent of all the parties * * *,' and this ' * * * intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences.' Article 1945. 'The words of a contract are to be understood, like those of a law, in the common and usual signification, without attending so much to grammatical rules, as to general and popular use.' Article 1946. 'When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms'. Article 1950. And 'When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation.' Article 1956. See, also, Boisseau v. Vallon & Jordano, 174 La. 492, 141 So. 38; Salles v. Stafford, Derbes & Roy, 173 La. 361, 137 So. 62; Pratt v. McCoy, 128 La. 570, 54 So. 1012; Losecco v. Gregory, 108 La. 648, 32 So. 985; Linehan Ry. Transfer Co. v. New Orleans & N. W. R. Co., 107 La. 645, 31 So. 1026; McKie v. New Orleans, J. & G. N. R. Co., 16 La.Ann. 79, and Workman v. Insurance Co., 2 La. 507, 22 Am.Dec. 141, as well as Union Tank Car Co. v. Louisiana Oil Ref. Corp., 184 La. 121, 165 So. 638; and 13 Corpus Juris 520, paragraph 481." 192 La. at pages 12–14, 187 So. at page 39.

In the case relied upon so heavily by plaintiff—Long-Bell Petroleum Company v. Tritico, supra, the Court said:

"In considering the primary question presented by plaintiffs' pleadings—that is, that two new servitudes were created affecting the tracts transferred in the 1941 deeds, and that the servitude established by the 1936 deed in favor of the plaintiff Petroleum Company, insofar as the property here involved, was extinguished—we do so in the light of the foregoing authorities and in accordance with the intention of the parties as reflected by their contract, for 'The contract must be viewed as a whole, and the intention of the parties gathered from all its parts, *to the end of giving practical effect to the instrument in the way intended * * **.' Calhoun v. Ardis, 144 La. 311, 313, 80 So. 548, 549. See Revised Civil Code, Arts. 1764, 1945–1962; State ex rel. Bourgaux v. Fontenot, 192 La. 95, 187 So. 66; Moriarty v. Weiss, 196 La. 34, 198 So.

643." 216 La. 426, at pages 453–454, 43 So.2d 782, at page 792.

In Watkins Co. v. Stanford, La.App. 1951, 52 So.2d 325, the Court said (syllabus):

"In determining the rights, obligations, and relationships arising from an instrument, the courts will seek the intention and purpose of the parties, and in so doing all the pertinent facts and circumstances, including the parties own construction of its meaning and operative effect, are weighed and considered."

In New Orleans Terminal Co. v. Dixie Rendering, La.App.1938, 179 So. 98, it was said (syllabus):

" * * * [T]he intention of parties to a contract must be gathered, not from a single sentence or word, but from the whole instrument read in light of circumstances existing at the time of negotiations leading up to its execution of contract." See Miller v. Robertson, 266 U.S. 243, 45 S.Ct. 73, 69 L.Ed. 265.

With these principles in mind, let us examine the instrument here involved.

■■ Here all of the owners (both of the surface and of the minerals) collectively combined themselves together in order to convey, *by warranty of title*, the title to the lands and to one-fourth of the minerals thereunder, while reserving *to* "the vendors" three-fourths of the minerals. The words "the vendors" to whom this interest was reserved refer, of course, to all those who appeared in the act as conveyors—the Stells, Mrs. Townsend and her children. Without the latter having joined, it would have been impossible for W. G. Stell and Mrs. Nancy Stell to have conveyed the one-fourth mineral interest to plaintiff, and to have reserved three-fourths to themselves because they only owned, respectively, one-fourth and five-twelfths, or a total of two-thirds.

In his brief, plaintiff contends that the instrument provides that *each* vendor sells his interest in the lands and one-fourth of his mineral interest, and *each*

reserves three-fourths *of such minerals as he owned prior to the sale*. No such language is to be found in the instrument. What is declared, and all that is declared, is that:

1. The Stells and Mrs. Townsend collectively sold the land and one-fourth of the minerals thereunder to Elkins, in the proportions set forth.

2. They collectively warranted the title which they conveyed.

3. They collectively reserved three-fourths of the minerals to themselves.

That the language used in this reservation was sufficient to create a new servitude has been held by the Louisiana Courts so often that no citation of authority is necessary.

Such was held in the cases principally relied upon by the plaintiff—Long-Bell Petroleum Company v. Tritico, supra, and Long-Bell Lumber Company v. Granger, 1952, 222 La. 670, 63 So.2d 420.

Briefly, the facts of Tritico were these:

Long-Bell Lumber Company wholly owned the lands there involved, prior to their sale to Tritico's ancestors in title. In 1931, Long-Bell Lumber Company conveyed to Long-Bell Petroleum Company a full mineral servitude covering the subject tract and a large contiguous area, comprising several thousand acres, thus creating a single servitude on a vast acreage.

In 1941, while the 1931 servitude was still outstanding, and while Lumber Company owned all the lands and Petroleum Company thus still owned all the minerals, the two companies joined together as vendors in conveying the lands to Tritico's ancestor. In the act of sale, there was attempted to be reserved to Petroleum Company all the minerals underlying the subject tract.

Because, at the time of the sale to Tritico's author in title in 1941, Petroleum Company owned all the minerals, and none of the lands, and Lumber Company owned all of the lands, and none of the minerals, it was held that the at-

tempted reservation to Petroleum Company was ineffective either to establish a new servitude, or to extend the old one, and the Court upheld Tritico's position. Since Tritico was not the original purchaser (being a third party), the only evidence which the Court could consider in determining the true intent of the parties was the two instruments of record when Tritico acquired— 1) the original mineral servitude, established in 1931, which as noted affected not only Tritico's lands but a large contiguous acreage, and 2) the 1941 deed to Tritico's ancestor.

The Court held that it was its duty to interpret the attempted reservation and give effect to it according to the intention of the parties, but said that with nothing before it except the two instruments mentioned to establish the intention of the parties, and because there were included therein certain protective rights in favor of the purchaser respecting the development of the minerals, which he would not have enjoyed otherwise, it was forced to the conclusion that the parties had not intended to create a new servitude; that the appearance of Petroleum Company as one of the vendors was for protective purposes only, rather than for the establishment of a new right. Supporting its conclusions, the Court pointed to these controlling factors, holding in effect that:

1. Petroleum Company already owned *all* the minerals, and the reservation which was made to Petroleum Company, alone, and not to the vendors, jointly, indicated that an 'exception', rather than a 'reservation', was intended.

2. Petroleum Company's 1931 servitude covered a large contiguous acreage, of which the Tritico lands were only a small part. From this, the Court reasoned that since the original servitude, covering a large acreage, would be lost if that servitude was held to have been renounced, it would be unsafe to conclude that Petroleum Company intended to renounce or relinquish the servitude owned by it affecting the larger area, in order that Lumber Company might effectively establish a new servitude on a smaller area.

3. The Court further pointed out that only a landowner may establish a servitude, and then only to the extent of such minerals as he owns, and since the deed did not expressly declare that Petroleum Company was renouncing its servitude to Lumber Company, it would not be proper to assume that a renunciation of a right covering several thousand acres was intended so as to make effective the reservation by the *landowner* on the smaller area.

4. The fact that the deed contained the protective clauses aforementioned. From these factors, the Court concluded:

"It is our opinion that the clause contained in the two deeds was intended for the protection of the vendor Long-Bell Farm Land Corporation under its warranty, and also for the protection of the vendees against damage or inconvenience they might suffer through the use of the servitude. Hence the reason for the appearance of the Petroleum Company in those deeds." 216 La. 455, 43 So. 2d 792.

In the present case there was a "reservation" of mineral rights and not an "exception". The significance of this distinction lies in the fact that, as the term relates to, and is commonly used in connection with deeds, a "reservation" is the creation of a *new right* issuing out of the thing granted which did not exist before as an independent right, while an "exception" is something *in esse* at the time of the sale, and which is excepted from the operation of the conveyance.

The difference between a "reservation" and an "exception" was pointed out in United Gas Public Service Co. v. Roy, La.App.1933, 147 So. 705, 706, the facts of which case as stated by the Court were:

"Loye McDade held fee-simple title to W.½ of S.W.¼, section 13, township 17 north, range 12 west, in Bossier Parish, La. On July 23, 1923, he sold to H. S. Skannal one-half of all the oil, gas, and other minerals on, in, and under said tract. On December 2, 1925, McDade executed a credit deed to Claude Durham, the description of the property therein conveyed being as follows:

" 'W.½ of S.W.¼ of Section 13, Township 17 N., Range 12, containing 80 acres, more or less;

" 'Reserving to this vendor an undivided one-half of all oil, gas or other mineral rights on or under the S.W.¼ of the S.W.¼ of said section.' "

Presented for decision there was the question of whether McDade, by that reservation, was intending to reserve the same half interest previously sold to Skannal, or whether he intended to reserve to himself the half interest remaining after his sale to Skannal.

Said the Court:

"The intention of those signing contracts as principals must, in the absence of fraud, error, etc., be sought from the contents of their contracts, in conjunction with other writings by them involving or referring to the same subject-matter, coupled with their own acts reflecting their own understanding of the meaning of the terms and stipulations thereof. If this intention can be arrived at from a construction of one, or more than one, instrument of record, then the public is impressed with the full extent of such intention and must be governed accordingly, especially when real rights or real property are involved.

\*　　\*　　\*　　\*　　\*　　\*

"The word 'reservation,' as employed in sales of land, wherefrom the whole or an interest in minerals is withheld, or title thereto is not intended to pass, has a distinct meaning, and, while often used in-terchangeably with the word 'exception,' in reality and technically, differs widely in legal effect from it. *A reservation, strictly speaking, is a clause in a deed creating or reserving something out of the thing granted that was not in existence before, while an 'exception' is something existing before as a part of the thing granted, and which is excepted from the operation of the conveyance.* Donnell v. Otts (Tex.Civ. App.) 230 S.W. 864; Stanton vs. [T. L.] Herbert & Sons, 141 Tenn. 440, 211 S.W. 353; 8 Ruling Case Law, § 146 par. 1088.

"To express it differently, a 'reservation' in a deed creates a new condition, arising from the taking back of something out of that which is granted, and an 'exception' is of some part of the estate not granted at all. The former relates to a new thing or condition created, which had not previously existed independent of the fee, while the latter in effect relates to and recognizes previously existing conditions qualifying or limiting the title of the grantor in the thing.

"Thornton's Law of Oil and Gas (4th Ed.) vol. 2, p. 1603 § 854(e), clearly draws a distinction between exceptions and reservations in deeds conveying surface rights. He says: 'An exception in a deed is something existing before as a part of the thing granted and which is excepted from the operation of the conveyance; but a reservation is something created out of the granted premises that was not in existence before.' "

The conclusion of the Court was as follows:

"In view of the authorities cited and of the expressions of the court in the Nabors Oil & Gas Company Case, above referred to and quoted from, it seems clear to us, without any strained interpretation, that the reservation in the deed from McDade to Durham did not inure or relate to the pre-existing mineral rights own-

ed by Skannal, *but in reality created a new condition, thing, or right, independent of the sale of the land, which had not previously existed apart and independent of the land itself.*" (Emphasis supplied.) [3]

In 37 Words and Phrases, under the title Reservation, p. 165, are to be found extracts from many cases setting forth the meaning of a "reservation", and distinguishing it from an "exception". We quote some of those extracts below:

"A 'reservation' is a clause in a deed whereby grantor reserves some new thing to himself issuing out of the thing granted and not in esse before. Kahoohuli v. Hamauku, 8 Haw. 50, 52."

" 'Reservation' is creation in behalf of grantor of new right issuing from thing granted. A 'reservation' is the creation of a new right something which did not exist as an independent right before the grant. City of Jacksonville v. Shaffer, 144 So. 888, 890, 107 Fla. 367."

"A 'reservation' in a deed applies to a thing not in esse at the time of the grant, but newly created, and which is reserved for the benefit of the grantor; as, for example, the reservation of a right of way over the estate conveyed, which, though it may have been previously enjoyed by the grantor as owner of the estate, becomes a new right. Therefore a so-called reservation of an exclusive power of alienation on the part of the wife of a grantor in a deed was void. Blair v. Muse, 2 S.E. 31, 32, 83 Va. 238."

"A 'reservation' is a clause in a deed whereby the grantor reserves some new thing to himself out of that which he granted before. In case of a 'reservation,' the fee passes, and the grantor reserves to himself some right, privilege, or easement. A deed conveying a portion of a quarter section of land by metes and bounds, and declaring, 'provided, however, that a strip * * * 60 feet wide on the east and a strip * * * 80 feet wide on the south and a strip * * * 100 feet wide on the west of said tract * * * is hereby reserved for street purposes when said quarter section * * * shall be platted,' creates a 'reservation' in the strips, and the fee passes to the grantee. Edwards v. Brusha, 90 P. 727, 728, 18 Okl. 234."

"A reservation is a clause in a deed creating or reserving something out of the thing granted that was not in existence before. Winston v. Johnson, 45 N. W. 958, 959, 42 Minn. 398; Fischer v. Laack, 45 N.W. 104, 105, 76 Wis. 313; Langdon v. City of New York, N.Y., 6

In the case at bar, the right (in the nature of a servitude) which was reserved to the grantors *was not in esse as an independent right prior to the contract.* True, they had the right to explore the land for oil and gas, but they

Abb.N.C. 314, 321; Gould v. Glass, N. Y., 19 Barb. 179, 192; Barnes v. Burt, 38 Conn. 541, 542; Gay v. Walker, 36 Me. 54, 60, 58 Am.Dec. 734; Morrison v. First Nat. Bank, 33 A. 782, 88 Me. 155; State v. Wilson, 42 Me. 9, 21. A reservation is something taken back out of that which is granted, such as rent, or some right to be exercised, such as the cutting of timber. Youngerman v. Polk County Sup'rs., 81 N.W. 166, 167, 110 Iowa 731; Randall v. Randall, 59 Me. 338, 340."

"The distinction between a 'reservation' and an 'exception' in a deed is that the subject of the former is something which did not exist before but is created by and grows out of the transaction, while an 'exception' is of something or some right previously existing. York Haven Paper Co. v. York Haven Water & Power Co. [C.C.], 194 F. 255, 267."

"The distinction between an 'exception' and a 'reservation' in a deed is that a reservation is something issuing out of the thing granted, while an exception is a part taken out of it, and a right of way of easement is something issuing out of the thing granted, while the fee is the thing itself and the terms 'subject to,' 'reservations,' and 'easements' are words of limitation, restriction, and condition, and not words of conveyance or exception. Auburn & S. Electric R. Co. v. Hoadley, 195 N.Y.S. 517, 521, 119 Misc. 94."

"A 'reservation' is a clause in a deed whereby the grantor reserves some new thing to himself out of that which he had granted before; that which issues from or is incident to the thing granted, and not a part of it; something newly created out of the granted premises; that part of the deed or other instruments which reserves a thing granted that was not in existence before. It is always of something taken back out of that which is clearly granted, and is never of any part of the estate itself, but something issuing out of it. It is thus distinguished from an exception, the office of which is to take something out of the thing granted that would otherwise pass. Barrett v. Kansas & Texas Coal Co., 79 P. 150, 151, 70 Kan. 649, quoting and adopting 13 Cyc. 672."

had such right as an incident of ownership of the land itself, and not as an independent reserved right. The right reserved was a charge upon the land—not a right in the land; it was a right having entirely different characteristics from their prior rights; it was a right in the nature of a servitude, and, unless used within the time prescribed by law, would become extinguished, whereas, prior thereto, the landowner's right of exploitation was unlimited and imprescriptible so long as they owned the lands.

In the light of the authorities cited, and the facts here presented, we are convinced that a true "reservation" was here intended, whereas in Tritico the Court in effect held that an "exception" was meant to be set forth in the deed, as far as Lumber Company was concerned.

None of the factors which impelled the Court to hold in Tritico that the parties had not intended to renounce the old servitude or establish a new one, their joinder being purely for protective purposes, are present in the case at bar.

Here the 1938 servitude covered only the lands which were included in the sale to Elkins. That servitude *did not cover any additional lands*, and, hence, the reasoning of the Court in Tritico that since the Long-Bell servitude covered other lands, it was doubtful that the mineral owner would have intended to renounce a servitude covering a large acreage in order to make effective a new servitude covering only a much smaller tract, is without application. Here, it cannot be presumed that they must have intended to preserve the 1938 servitude in order to protect their rights upon any additional lands which it affected, for there were no other lands affected by the old servitude. Such was true in Tritico; such is not true here.

Likewise, in Tritico, the landowner owned no minerals, and, owning none, the Court held it could reserve none. McDonald v. Richard, 203 La. 155, 13 So.2d 712; Gulf Refining Co. v. Orr, 207 La. 915, 22. So.2d 269; McMurray v. Gray, 216 La. 904, 45 So.2d 73. Such is not true in this case. Here the landowning vendors owned three-fourths of the minerals to which no servitude was applicable, and, including the one-half of the one-fourth servitude owned by the Stell minors, who were also landowners, the landowning vendors owned seven-eighths of the minerals.

■ There is no prohibition in the laws of Louisiana against a landowner establishing a servitude, either in favor of himself or others, by a reservation of minerals when he sells the lands, if at the time of the reservation he owns minerals to the extent of his reservation.

■ Owning, admittedly, by non-servitude title, three-fourths of the minerals, they could create a new servitude to the extent of the minerals owned. They reserved three-fourths; they had three-fourths to reserve; and, to the extent of their ownership, that reservation must be held effective.

In Tritico, the deed contained protective covenants running in favor of the vendee. None are to be found in the deed here involved. Obviously, such protective covenants in Tritico strongly influenced the Court in ascertaining the intention of the parties. Since no protective covenants are to be found in the Elkins deed, it logically follows that these vendors appeared in this deed for an entirely different reason than that which was found by the Court to be the reason for the mineral owner joining with the landowner in the Tritico deed. That reason, we think, is perfectly obvious. They were intending to establish a new servitude, and they were intending to vest Elkins with a completely unencumbered title, in accordance with their warranty, to that which was being conveyed.

Still another fact which distinguishes this case from Tritico is that there Petroleum Company owned all the minerals. Thus, exactly the *same thing* was attempted to be reserved to the *same owner* in the *same proportion* as was owned before the deed was executed. In this case, Mrs. Townsend and her children

owned together one-fourth of the minerals before the sale. The deed did not reserve this one-fourth to Mrs. Townsend and her children, nor was a similar interest reserved to anyone. What was here reserved was an entirely different interest to entirely different persons—a three-fourths interest to "the vendors", which included not only Mrs. Townsend and her children, but also Mrs. Nancy Stell and W. G. Stell. Obviously, then, the right thus created was a new right, because no right such as that which was created by this deed had existed before.

Finally, in Tritico, the Court did not hold that the *language* in which the reservation was couched was insufficient to create a new servitude. It held that the reservation was ineffective to establish a new right for *two* reasons, and two reasons only:

1. Because the Court found that the parties had *not* intended to establish a new right, but had joined together for protective purposes, only.

2. Because the Court found that even if the parties had so intended, the establishment of a new right was legally impossible because, and solely because, the landowning vendor (who alone could create a new right) owned no minerals, and owning none, could reserve none.

This is made perfectly clear by the subsequent case of Long-Bell Lumber Company v. Granger, 1952, 222 La. 670, 63 So.2d 420, 422, wherein the Court said:

"True, the language of the mineral reservation in the 1941 deeds involved in the Tritico case was identical with that of the reservation (relied on by plaintiffs herein for establishing their title to the minerals) contained in the 1943 deeds through which these defendants acquired their lands. And it is also true that in such litigation this court (a majority on rehearing) concluded that the reservation had only a protective purpose and that it did not place the title to the minerals in the Petroleum Company, thereby creating new servitudes. (With that conclusion, the author of this opinion disagreed, his view, to which he still adheres, having been expressed by him on the original hearing.) *But from a careful reading of the majority opinion on rehearing in the Tritico matter it clearly appears that the reservation* * * * *was so held to be ineffective because, and solely because, those deeds were executed within ten years from the date of the original servitude of December 29, 1931 (different from the 1943 deeds here), at which time the vendor, Farm Land Corporation, had no minerals to reserve. It was not said therein that the language of the reservation was insufficient in itself to create a mineral servitude. In fact, on the contrary, the observation was made that under the express provisions of the deeds title to the minerals never passed to the vendees.*" (Emphasis supplied.)

The Granger case, as noted in the quotation, involved a mineral reservation in language identical with that contained in Tritico. In Granger, however, the deed containing the reservation was not executed until 1943, at which time the 1931 servitude referred to in Tritico had prescribed for non-user, so that when Granger's deed was executed by Lumber Company and Petroleum Company, as vendors, Lumber Company (the landowner) owned *all* the lands and *all* the minerals and Petroleum Company owned no interest of any kind therein, whereas, in Tritico, on the date of the deed, Lumber Company owned all the lands, but none of the minerals, and Petroleum Company owned all the minerals, but none of the lands.

In both cases, the reservation was to Petroleum Company. In Granger, the defendant contended that since the reservation was to Petroleum Company, and since Petroleum Company had nothing to reserve, and since Lumber Company (who, alone, had the right to reserve, or convey) had not "conveyed" to Petroleum Company, perforce Petroleum Com-

pany had no rights to the minerals. The Court answered this contention thus:

> "On the execution of the 1943 deeds Farm Land Corporation owned, as before shown, not only the lands but also the minerals. It alone, at that time, had the right to make a mineral reservation. And a reservation for the benefit of Petroleum Company was effectively consummated through its signing of the deeds which recited that the minerals are 'expressly reserved unto the Long-Bell Petroleum Company, Inc., its successors and assigns.' This reservation is in the nature of a stipulation pour autrui, the validity of which is recognized by the laws and jurisprudence of this state. Especially appropriate is LSA–Civil Code, Article 1890, which declares:
>
> " 'A person may also, in his own name, make some advantage for a third person the condition or consideration of a commutative contract, or onerous donation; and if such third person consents to avail himself of the advantage stipulated in his favor, the contract can not be revoked.' " 222 La. 679, 63 So.2d 423.

 Applying this rule and reasoning here, it is obvious, we think, that in the deed of November 6, 1946, the land-owning vendors, in order to consummate the transaction with Elkins as agreed, were willing to, and did by virtue of the reservation, rearrange the mineral ownership among themselves and Mrs. Townsend to the extent necessary to effect the agreement. In other words, since Mrs. Townsend was receiving no part of the cash price paid by Elkins for the land and a one-fourth interest in the minerals, and her children were paid only for their interest in the land and nothing for their minerals, they—defendants—were made by W. G. Stell and Mrs. Nancy Stell the third-party beneficiaries of a stipulation *pour autrui* to the extent necessary for the vendors collectively to have become the owners of a new three-fourths interest in the minerals, it naturally following, of course, that each vendor, after the sale, would own a new mineral interest in the three-fourths reserved in proportion to his or her former ownership of the whole.

Moreover, we think it was clearly the intention of the parties, in executing the deed, although not expressly declared, that in order to effectuate the transaction as agreed, necessarily Mrs. Townsend and her children tacitly renounced the 1938 servitude. Such a tacit renunciation is authorized by Louisiana law:

> "Servitudes are also extinguished by the renunciation or voluntary release of them by the owner of the estate to which they are due. This renunciation or release may be express or tacit." LSA–Civil Code, Article 816.
>
> "Servitudes are extinguished:
>
> * * * * * *
>
> "5. By the renunciation of the servitude on the part of him to whom it is due, or by the express or tacit remission of his right." LSA–Civil Code, Article 783.

As long ago as 1858, in Delahoussaye v. Judice, 13 La.Ann. 587, the Louisiana Supreme Court gave recognition to the Codal provision that a servitude may be tacitly renounced.

In the case before us, these defendants voluntarily consented in writing to the establishment of two new rights, one to "the Stells" and the other to Elkins, which added together comprised the whole. If the two rights thus created are to be effective, then necessarily the old (1938) right must be considered as having been remitted.

 Put another way, and considering the presumed intention of all the vendors in the deed, when the servitude owners not only permitted but actively joined in the creation of new mineral estates which, when taken together, aggregate the entire estate, such action on their part presupposes the annihilation of any prior rights they held. Necessarily, no landowner can enjoy a greater right to the minerals thereunder than *all*

—the entirety—and when that estate is so divided that one acquires the right to one-fourth of the minerals, and a group collectively acquires the other three-fourths, as here, if prior to that division, one or the other of the parties had owned a separate and distinct right to a part of the minerals, such prior right *ex necessitate* is extinguished; otherwise, the partition is ineffective.

Accordingly, we find and hold that, in executing the deed of November 6th, 1946, containing the reservation in question, Mrs. Townsend and her children tacitly renounced the 1938 servitude, which no longer existed thereafter, and was replaced by the new reservation.

 In this case, therefore, if no other evidence be resorted to than that found in the "four corners" of the 1946 deed, in order to ascertain the meaning and intent of the parties, we must conclude:

1. That the intention of the parties was to establish a new right, while having defendants renounce the 1938 mineral servitude.

2. That the language in which the deed and mineral reservation were confected was in all respects sufficient to accomplish their intentions.

3. That since the landowners owned as much, if not more minerals than were reserved, they could validly reserve, and did validly reserve, a servitude to the full extent of that which was reserved.

4. That the fact that Mrs. Townsend owned no interest in the lands and that her children owned a greater interest in the minerals than they owned in the lands is a matter of no consequence; that since the landowners had as great an interest as was reserved, they had the right to reserve such interest either to themselves or to a third party, and to the extent that the right which was reserved inured to the benefit of one who was not a landowner, the reservation was valid as a stipulation *"pour autrui vie"*. Here the beneficiaries of such stipulation were defendants.

 For these reasons, therefore, we believe the instrument under consideration by and of itself clearly requires that there be judgment for defendants. If we are mistaken, however, and if the reservation is ambiguous and susceptible of more than one interpretation, then we must consider the extrinsic evidence [4] in the record in order to determine the true intent of the parties. That evidence, clear and uncontradicted, points only one way—in favor of defendants.

Unfortunately, two of the vendors in the act of sale, and the attorney who prepared it, are now dead. Judge Watkins died in 1949; W. G. Stell and Mrs. Nancy Stell died later. The Notary who passed the instrument (Judge Watkins' secretary) identified his file at the trial, but testified that she had no independent recollection of the transaction.

Judge Watkins' file clearly shows his understanding of the intention of the parties, and his awareness of the outstanding one-fourth mineral interest owned by defendants prior to confection

4. Under such circumstances, extrinsic evidence is admissible. See Gulf Refining Co. v. Garrett, 1946, 209 La. 674, 25 So. 2d 329, at page 338:

"It is elementary that in the interpretation of a contract the court must give legal effect to the instrument according to the true intent of all the parties, and such intent is to be determined by the words used therein. * * * when these are clear and explicit and lead to no absurd consequence. Revised Civil Code, Article 1945; Hello World Broadcasting Corporation v. International Broadcasting Corporation, 186 La. 589, 173 So. 115; Rudman v. Dupuis, 206 La. 1061, 20 So.2d [3] 263. Where, however, the instrument is so ambiguous that it creates doubt as to what the parties intended, extrinsic evidence may be resorted to as an aid in its construction. Bank of Napoleonville v. Knobloch & Rainold, 144 La. 100, 80 So. 214; Holloway Gravel Company, Inc., v. McKowen, 200 La. 917, 9 So.2d 228; Rudman v. Dupuis, supra.

of the deed of November 6, 1946. He understood the agreement between the parties—that "the Stells" were to get three-fourths of the minerals, and Elkins the land and one-fourth—and he undertook to, and did, reduce the agreement to writing exactly as the parties wanted it accomplished. He was an able and experienced attorney, well versed in Louisiana law, who in effect was representing all the parties, including Elkins.

It is to be especially noted that Judge Watkins' memorandum of the agreed transaction, and the petition for approval by the State Court, prepared by him and quoted above, did not state that "the Stells" were to reserve, nor was Elkins to buy, portions of a pre-existing servitude. Rather, it obviously was his understanding that new estates were to be created, by the vendors joining together collectively, with Elkins purchasing the land and one-fourth of the minerals, and with "the Stells" retaining a new servitude to the extent of three-fourths of the minerals.

Mrs. Nancy Stell and Mrs. Townsend (then Mrs. Arthur G. Stell) specifically inquired of Judge Watkins, prior to execution of the deed, as to the duration of the three-fourths reserved interest. They were told by him that the interest of *all* the major vendors would last for ten years, and that of the minors until their majority and then for ten years, this being a correct statement of the Louisiana law at that time,[5] if the parties intended that defendants would tacitly renounce their outstanding one-fourth mineral interest, and that a new servitude, to the extent of three-fourths of all the minerals, be reserved to "the Stells". Mrs. Townsend testified that she would not have executed the deed, and conveyed without consideration, a one-thirty-second mineral interest in 165 acres, if she had not been assured by Judge Watkins that her interest would continue for ten years.

In preparing the State Court proceedings for approval of the sale by the minors, Judge Watkins particularly declared, as he did in the deed, that there was to be " * * * a reservation to the Stells of an undivided three-fourths (¾) of the oil, gas and other, minerals * * * ". This obviously meant three-fourths of *all* the minerals. He did *not* state that there was to be reserved to them, as contended by plaintiff, three-fourths of the mineral interests owned by them prior to execution of the deed.

Plaintiff himself testified that at the time the deed was executed he was only interested in obtaining title to the land and one-fourth of the minerals. He knew nothing about the 1938 servitude until 1953, more than six years after he acquired the property. Obviously, he did not consider that any minerals had reverted to his title for non-user, for on January 13, 1953, he executed a lease in favor of Carter Oil Company and accepted a bonus on the basis of his then owning only a one-fourth interest in the minerals. He also admitted he knew that three-fourths of the minerals were being reserved to "the Stells".

Likewise, on April 23, 1953, Mrs. Townsend executed a lease to Carter for Lucy Ann Stell, who was still a minor, on the basis of defendants owning with respect to the 1946 servitude only, and with no mention being made of any interest deriving from the 1938 servitude. She and her son, Arthur G. Stell, Jr., also joined with Mrs. Nancy Stell on April 1, 1953, in executing a lease to the same company, thus indicating that they all considered the 1946 servitude to be still in effect.

Mrs. Ardis Burns, who served as a witness to the deed, and Mr. Burns, who was under-tutor for the Stell children and who actually negotiated the sale, both understood that "the Stells" were to retain a three-fourths interest in *all* the minerals. Mrs. Burns further testified

5. Act 232 of 1944 of the Louisiana Legislature. See also note following LSA-R.S. 9 :5805. Since 1950, however, the law has been changed so that prescription runs against minors, just as against majors, from the date of the mineral reservation.

that, when the deed was executed, Judge Watkins explained that the adults' mineral interests would continue for ten years, and the minors' for ten years past their majority. She was not sure whether plaintiff heard this explanation.

Thus it is seen that all the evidence—the deed itself, and its supporting documents, the understanding of the parties prior to its confection, and the interpretation placed thereon by the parties subsequent thereto, at unsuspicious times—points unerringly to what was intended and understood to have been accomplished: that there was a renunciation or merger of the old (1938) servitude into the fee ownership, and the creation of a *new* right to the minerals being reserved, which would remain a burden on the land unless lost by nonuser after ten years from the date of the 1946 deed. Such the parties intended; such they considered as having been done; and such was done.

### Ruling

For these reasons, therefore, there will be judgment herein in favor of defendants, and against plaintiff, rejecting his demands at his cost.

Present proper decree on notice.