ONÈSIPHORE DELAHOUSSAYE et al. *v.* ALEXANDER JUDICE et als.

When a servitude is due by an estate below to receive the waters of the estate above, the proprietor
below is not at liberty to raise any dam, or to make any other work to prevent the running of the
water, and the proprietor above can do nothing whereby the natural servitude due by the estate
below may be made more burdensome.

To acquire the right to a continuous and apparent servitude by prescription, the enjoyment of it must
be absolute and uninterrupted during ten years, and not dependant only upon a precarious permission
from the debtor.

Where the creditor of the servitude, to stifle the complaints of the debtor and prevent a law suit, himself
erects works totally obstructing the servitude, at the request of, and by agreement with, the debtor.
*Held :* that he thereby makes a tacit renunciation of the servitude.

APPEAL from the District Court of the Parish of St. Martin, *Martel,* J.
DeBlanc & Fuselier, for plaintiffs. *Simon & Gary,* and *J. G. Olivier,* for
defendants and appellants.

SPOFFORD, J. The defendants have appealed from a judgment of the District
Court ordering the stoppage of an artificial canal cut upon some of the defend-
ants' lands, for the purpose of draining certain *marais,* or ponds, situated within
territory belonging to the defendant, into Pointe Claire Coulée.

The plaintiffs complain that, by this artificial work, their lands adjacent to the
Pointe Claire Coulée are subjected to an unnatural burden by receiving waters
from which they would otherwise be exempt, and thus being made more liable to
overflows.

The first point in the defence is a denial that the canal causes any grievance to
the plaintiffs, or subjects them to greater risk of overflow.

If it does not, it is difficult to see why the defendants seek to keep the canal
open ; if their *marais* would otherwise be drained as rapidly and well, the canal
must be useless to them ; it could only have been cut for the purpose of drainage ;
it must, of course, if it fulfills its office, swell the waters of the coulée, into which
it flows, faster than they would be swollen through the more shallow natural out-
let of these ponds into the same coulée, by another and a more devious course.

And to this effect is the testimony of the greater number of witnesses who have
had the best means of judging ; that the lands of the plaintiffs are burdened by
a greater and more rapid flow of waters since the cutting of the canal in question,
than before ; and that this is occasioned by the canal, and not merely by certain
trifling obstructions in the branch of the coulée into which it empties.

The question of legal right has, therefore, to be determined.

It is a servitude due by the estate situated below to receive the waters which
*run naturally* from the estate situated above, provided the industry of man has
not been used to create that servitude.

The proprietor below is not at liberty to raise any dam, or to make any other
work, to prevent this running of the water.

*The proprietor above can do nothing whereby the natural servitude due by the
estate below may be rendered more burdensome.* C. C. 656 ; *Orleans Navigation
Co.* v. *Mayor,* 2 M. 233 ; *Martin* v. *Jett,* 12 La, 503.

The force of Article 656, as interpreted by this court, is not impaired, as the
appellants seem to contend, by the succeeding Article, which relates simply to
the *use of the water* running through one's estate, but does not give the owner

any right to swell its volume, by the artificial drainage of lakes into it, to the detriment of an inferior estate. "He whose estate borders on running water *may use it as it runs,* for the purpose of watering his estate, or for other purposes:

He through whose estate water runs, whether it originates there or passes from lands above, may make use of it while it runs over his land; but he cannot stop nor give it another direction, and is bound to return it to its ordinary channel where it leaves his estate." C. C. 657.

Although the beginning and the exit of this canal be upon premises owned by some of the defendants, and although it disgorges its waters into a natural coulée which also runs through their lands, yet, if it renders the natural servitude due by the plaintiffs' lands to defendants more burdensome, it is within the prohibition of Article 656.

And we find that it does carry waters upon the debtor estates which did not run naturally there; the industry of man has been used to effect this result; the natural servitude due by the lower lands has been thus made more burdensome. It follows then, that the canal complained of was, in its inception, an invasion of the plaintiffs' right.

But the defendants say that this is a servitude of aqueduct, which is a continuous and apparent servitude, (C. C, 720, 723, 724;) that a continuous and apparent servitude may be acquired by a possession of ten years, if the parties be present, and twenty if absent, (C. C. 761;) and that, having been in the enjoyment of this servitude for more than ten years, they have acquired it by prescription.

The canal was cut by *Désiré Dugas,* then proprietor of the land across which it runs, in the year 1833 or 1834. In 1844, he sold this land to *Judice,* one of the present defendants. But, during the period of his ownership, the canal was not uninterrupted, and he appears to have had but a precarious enjoyment of the servitude it created or augmented upon the plaintiffs' lands. He testifies as follows: "On one occasion *Onèsiphore Delahoussaye,* one of the plaintiffs, stopped it up; it remained closed for a month or two, during which time *Mr. Delahoussaye* was hauling wood for his sugar-house; when I saw that he had finished hauling said wood, I reopened said canal *as agreed on between me and Onèsiphore Delahoussaye,* who remarked at the time, that he would close up the canal again whenever it proved inconvenient to him, *as witness had no right to divert the waters from their natural course."* Such was the origin and nature of *Dugas's* enjoyment of the servitude which the defendants now claim by the prescription of ten years. As already stated, he sold the land with the canal upon it to the defendant, *Judice,* in 1844. It seems that the drain continued from this time without interruption until about seven years ago, to wit: in 1850 or 1851, when the plaintiff, *Delahoussaye,* was about to institute legal proceedings for the suppression of the canal as a nuisance to him. He had employed counsel to that end. It seems that there was then a general meeting of the parties interested, to see what adjustment could be made, without going to law; all the defendants in this suit were present; after a discussion, they agreed with the plaintiff, *Delahoussaye,* in order to prevent a law suit, that they would immediately stop up the obnoxious canal, at three places then designated by *Lézin LeBlanc* and *Valsain Bernard;* posts were planted at the designated places; the defendants, moreover, promised to pay part of the costs incurred by the plaintiff, *Delahoussaye,* for attorney's fees in relation to the matter, not to exceed $200.

In pursuance of this agreement, the work of stopping the canal was forthwith accomplished; the witness, *Louis E. Dugas*, testifies that " he himself went to see *Onèsiphore Delahoussaye*, and enquired of him whether he accepted the work done for the stopping up of the said canal; he was sent there by *Alexander Judice* with *Vestule Broussard*; Mr. *Onèsiphore Delahoussaye* accepted the work done, remarking that he would henceforth keep it up at his own expense. He furthermore required that the defendants should go and stop up also all the ditches that linked the different ponds together, *which defendants did on the same day.*"

It is true that this verbal compromise or agreement was afterwards disregarded by the defendants, who had the canal reopened—hence the present suit.

If it be conceded that the defendants have a right to add to the six or seven years' possession of this servitude by *Judice*, previous to the stoppage, the prior precarious possession of *Dugas*, and thus make a ten years' prescription at the date of the verbal compromise, (a point upon which we express no opinion,) still we think there has been a tacit remission of the servitude (assuming it to have been acquired), by which it was extinguished.

"Servitudes are extinguished * * * * * by the renunciation of the servitude on the part of him to whom it is due, or by the express or tacit remission of his right." C. C. 779. " The *express* release must be in writing." C. C. 813. " The release of the servitude is tacit where the owner of the estate to which it is due, permits the owner of the estate charged with the servitude to build on it such works as presuppose the annihilation of the right, because they prevent the exercise of it ; for example, if he should permit the field through which he has a right to pass to be enclosed by a wall." C. C. 815.

In order that the tacit release of the servitude be inferred from the permission which the owner of the estate to which it is due has given for the erection of works which prevent the exercise of it, it is necessary,

1. That the permission or consent for the erection of these works should be given expressly, *verbally*, or in writing. From the mere sufferance of works contrary to the servitude, the release cannot be presumed, unless it has continued for a time necessary to establish prescription.

2. That the works thus constructed be of a permanent and solid kind, such as an edifice or walls, and that they present an absolute obstacle to every kind of exercise of the servitude." C. C. 816.

The appellants cannot successfully contend that this latter Article must be restricted literally to the case where the debtor of the servitude makes an effective obstruction to its exercise, with the consent of the creditor ; for the case of a tacit renunciation is much stronger where the creditor of the servitude, to stifle the complaints of the debtor and prevent a lawsuit, himself erects the work totally obstructing the servitude, at the request of and by agreement with the alleged debtor. And that is the case here.

The presumption of a tacit renunciation is even more conclusive than in the cases put, by way of example, in the Code.

The bill of exceptions to the admissibility of the evidence concerning this tacit renunciation is untenable.

The other bills it is unnecessary to notice, as this tacit remission of whatever right may have been acquired by prescription, settles the case in favor of the plaintiffs.

The judgment, is therefore, affirmed.