**J. B. ELKINS, Appellant,**

v.

**Laura Stell TOWNSEND et al., Appellees.**

**No. 18612.**

United States Court of Appeals
Fifth Circuit.

Nov. 17, 1961.

Roy M. Fish, Springhill, La., Frank M. Cook and Charles D. Egan, Shreveport, La., for appellant.

John T. Campbell, Campbell, Campbell & Marvin, Minden, La., for appellees.

Before TUTTLE, Chief Judge, and CAMERON and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This litigation is over the ownership of an undivided three-sixteenths interest in oil and gas underlying certain land in Louisiana. J. B. Elkins, admitted owner of the land and one-fourth of the minerals, brought an action against Mrs. Laura Stell Townsend, and her two children, Arthur G. Stell, Jr. and Mrs. Lucy Ann Stell Polter, to be declared the owner of the disputed interest.[1] The district court held for the defendants. 182 F. Supp. 861. We reverse.

## I.

Certain basic principles of Louisiana law must be borne in mind throughout the discussion of this case. First, in Louisiana there is no ownership of oil and gas in place: the landowner's mineral reservation or sale of a mineral interest creates a terminable real right in the nature of a servitude.[2] Second, under the doctrine of liberative prescription, since a servitude is imposed only upon the land, its prescription or expiration in ten years for non-use inures to the benefit of the landowner.[3] Third,

---

1. Elkins, a citizen of Louisiana, sued in the Twenty-Sixth District Court for Webster Parish, Louisiana. The Stells, all citizens of Texas, removed the case to the United States District Court for the Western District of Louisiana, August 9, 1957. The complaint alleges that the value of the property in dispute exceeds $25,000 plus accrued royalties of $5,000. At the time the action was brought, there were several oil wells on the property producing over 400 barrels of oil a day. Federal jurisdiction is based on 28 U.S. C.A. § 1332.

2. "When oil and gas were first discovered in the State and the interests of those asserting rights to such oil and gas as a result of sales or reservation became controversial, this Court, recognizing that under our system of law there can be no other land tenure than perfect ownership and imperfect ownership, decreed that there could be no mineral estate in oil and gas as such and that the sale or reservation of minerals was the mere grant or retention of a right to go on the land for the exploration or exploitation of such minerals. Such right was classified as being a real right in the nature of a servitude, to be governed by the laws of this State on the subject matter. See Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 756, 91 So. 207; [other citations omitted] * * *. This Court, reasoning in the case of De Moss v. Sample, 143 La. 243, 78 So. 482, said: 'There is no law which forbids the owner of land to sever its constituent parts, and sell one or more of those parts and retain the remainder', and 'As the law does not forbid the owner of land to reserve to himself the minerals lying under the surface thereof * * *, such reservation properly became the subject, or

motive of the contract between the parties; and in the later case of Palmer Corporation [of Louisiana] v. Moore, 171 La. 774, 132 So. 229, 232, concluded: 'When a landowner sells only the mineral rights in his land, or sells the land and reserves the mineral rights, the transaction constitutes a *dismemberment of the ownership*, and is a sale or reservation, as the case may be, *of one of the elements of ownership*.' (Emphasis supplied); and classified such right to be a servitude." Chief Justice Fournet, on Rehearing, in Long-Bell Petroleum Co. v. Tritico, 1949, 216 La. 426, 43 So.2d 782, 791. See generally Nabors, The Louisiana Mineral Servitude and Royalty Doctrines: A Report to the Mineral Law Committee of the Louisiana State Law Institute, 25 Tul.L.Rev. 30 (1950), 25 Tul.L.Rev. 155 (1951), 25 Tul.L.Rev. 303 (1951), 26 Tul.L.Rev. 97 (1951); Daggett, Mineral Rights in Louisiana (1949).

3. Article 789, LSA–C.C. provides: "A right to servitude is extinguished by the non-usage of the same during ten years." Article 3546 provides: "The rights of usufruct, use and habitation and servitudes are lost by non-use for ten years." One of the most important features of Louisiana mineral law is that severed mineral interests are subject to the civil law concept of prescription *liberandi causa* for ten years non-use. Unless in that time there are good faith drilling operations, or an acknowledgment made for the specific purpose of interrupting the running of prescription, the land is cleared of any outstanding mineral interests. (The defendant here makes a half-hearted argument on acknowledgment, which the trial judge rejected and which we consider unnecessary to discuss).

only a landowner may create a mineral servitude and then only to the extent of his mineral interest.[4]

## II.

November 7, 1946, the Stell family conveyed 165 acres of land in Webster Parish, Louisiana, and one-fourth of their interest in the minerals to J. B. Elkins, plaintiff-appellant, "reserving" three-fourths of their mineral interest. The vendors were (1) W. G. Stell, (2) his sister-in-law, Mrs. Nancy Stell, widow of John T. Stell, (3) Mrs. Laura Stell (Townsend), widow of Arthur G. Stell, and (4) her children, Arthur G. Stell, Jr. and Lucy Ann Stell (Polter), grandchildren of John T. and Nancy Stell. Before this conveyance in 1946, W. G. Stell owned half of the land and a fourth of the minerals; Mrs. Nancy Stell owned five-twelfths of the land and minerals. There is no question as to the validity and effect of their reservation. Before the conveyance, Laura *had no ownership of the land* but, as widow in community, owned half of a one-fourth mineral interest her husband, Arthur, purchased May 16, 1938, from W. G. Stell, or one-eighth. Laura's children, Lucy Ann and Arthur, Jr., minors, together, as their legitime (forced heirship) from their father's succession, owned the other one-half of the one-fourth 1938 mineral interest, or one-eighth; in addition, as their legitime from their grandfather John Stell's succession, the children owned one-third of his community share in the land and minerals he had owned in indivision with W. G., or one-twelfth *of both the land and minerals*, giving them a total of five-twenty-fourths of the mineral interest. The trial judge's detailed summary of the Stells' acquisitions is helpful to an understanding of the division of ownership.[5] Elkins v. Townsend, D.C.1960, 182 F.Supp. 861, 863.

The dispute is over the 1946 reservation by Laura and her children of three-fourths of their one-fourth (three-six-

4. Hodges v. Norton, 1942, 200 La. 614, 625, 8 So.2d 618, 621; Ohio Oil Co. v. Ferguson, 1947, 213 La. 183, 238, 34 So.2d 746, 764; Wemple v. Nabors Oil & Gas Company, 154 La. 483, 97 So. 666, 667; Union Producing Company v. Parkes, D.C., 40 F.Supp. 163, 166; United States v. Nebo Oil Company, 5 Cir., 190 F.2d 1003, 1007. And, the owner of the surface of the land can create a mineral servitude only to the extent to which he owns minerals connected with his surface ownership. Liberty Farms v. Miller, 216 La. 1023, 45 So.2d 610, 614; Long-Bell Petroleum Company v. Tritico, 216 La. 426, 43 So. 2d 782, 791. "The theory that the power to create a mineral servitude is limited to a landowner who owns the minerals at the time of execution of either a sale or reservation thereof serves the two functions of fixing the landowner's alienation as the date for starting liberative prescription and of limiting the landowner's power to create a mineral servitude on a future date. The starting of liberative prescription on the date of the landowner's alienation of the minerals deprives a mineral owner of the power to renew or extend liberative prescription by his unilateral act of selling his interest in whole or in part. The requirement of ownership of the minerals by the landowner on the date of sale or reservation operates within a narrow field in controlling the creation of mineral servitudes in the future." Nabors, Report on Louisiana Mineral Law, 25 Tul.L.Rev. 155, (1951).

5. The trial judge found: "Prior to May 16th, 1938, two brothers, W. G. Stell, a single man, and John T. Stell, husband of Nancy Stell, owned the above described lands in indivision and in equal proportions. On that date W. G. Stell sold to Arthur G. Stell, husband of Laura Stell, who was the only living child of John T. Stell, an undivided one-fourth interest in the minerals underlying the subject lands. ¶ On July 30th, 1939, Arthur G. Stell died intestate, being survived by his widow (now Mrs. Laura Stell Townsend), and two minor children, Arthur G. Stell, Jr., born on January 2nd, 1930, and Lucy Ann Stell (now Mrs. Polter), born on June 11th, 1934. ¶ Following his death, Mrs. Laura Stell Townsend was regularly appointed as guardian for her two minor children by the probate Court of San Patricio County, Texas, where they were domiciled; and by appropriate ancillary proceedings, later held in Webster Parish, Louisiana, her appointment as such was recognized and confirmed by the Louisiana Court on January 14th, 1943. ¶ John T. Stell died on May 7th, 1946, being

teenths) mineral interest derived by them by inheritance of the mineral servitude W. G. sold to Arthur Stell in 1938. This servitude prescribed May 16, 1948 and the mineral interest it represented returned to the owner of the land, Elkins, unless three-fourths of it was, as the defendants-appellees contend, transmuted by renunciation into a new servitude by the 1946 deed. February 10, 1956, several producing wells were drilled on the property, interrupting the running of prescription on any servitude created less than ten years before.

Judge R. D. Watkins, an attorney and city judge in Minden, Louisiana, handled the 1946 conveyance for both Elkins and the Stells. After Arthur's death and the appointment of Laura, a native of Texas, as guardian of her two minor children, Judge Watkins represented Laura in ancillary proceedings in Webster Parish in having her qualified as tutrix for her children. He also represented Nancy and prepared her act of renunciation, in which she renounced her husband's bequest to the extent it impinged on the legitime of the children.[6] And, he was

the attorney for Elkins, who employed him to examine the title to the property and to see that the transfer was legally accomplished. There is nothing unusual about such representation in a small town, and the only probative inference that can be drawn is that Judge Watkins was not working any more for the Stells than for Elkins in drafting the conveyance and handling the transaction. W. G. Stell, Mrs. Nancy Stell, and Judge Watkins died before this action was brought. Judge Watkins's file, however, was produced in evidence. The first entry in his file reads as follows:

"¾ int to be reserved in minerals by Stells

Stells to get present lease rentals. other words

all    J. B. Elkins

. . . . . . . . . . . . . . . . . . . . . gets ¼

Stells ¾

taxes prorated as of sale"

In order for the minors' share to be sold, Judge Watkins prepared and filed in the Webster Parish District Court two petitions on behalf of Laura as tutrix:

survived only by his widow, Mrs. Nancy C. Stell, and his two minor grandchildren, Lucy Ann and Arthur C. Stell, Jr., who were his sole heirs at law. John T. Stell, who at the time of his death was a resident of Palo Pinto County, Texas, left a last will and testament, dated February 23, 1942, by which he bequeathed all of his property to his widow. This will was duly probated at his domicile in Texas. ¶ Later, on September 3rd, 1946, Mrs. Nancy Stell, being advised that the bequest of all of her husband's Louisiana property to her encroached upon the legitime (LSA–Civil Code Article 1493) of the surviving forced heirs of the deceased —his two grandchildren—executed an authentic act of renunciation, specifically renouncing the bequest in her favor to the extent that it impinged upon their legitime; i. e., she renounced all of the bequest in her favor in excess of two-thirds of her husband's one-fourth community interest in the subject lands. This act of renunciation, together with a certified copy of the will, was duly recorded in Webster Parish, Louisiana. ¶ Thus, as a result of the acquisitions, inheritances, and renunciation above set forth, the ownership of the property here

involved, on November 6th, 1946, was as follows:

'Surface Ownership

W. G. Stell . . . . . . . . . . . . . . . . . .1/2

Mrs. John T. (Nancy) Stell, (1/2 of 1/2 or 1/4 as community; 2/3rds of 1/4th by last will and testament of John T. Stell, total) . . . . . . . . .5/12ths

Lucy Ann and A. G. Stell, Jr., 1/3rd legitime of 1/4th, or) . .1/12th

Mineral Ownership

W. G. Stell . . . . . . . . . . . . . . . . . .1/4th

Mrs. John T. (Nancy) Stell, (as above) . . . . . . . . . . . . . . . .5/12ths

Mrs. Laura Stell Townsend, widow of A. G. Stell, Sr., (community 1/2 of 1/4th mineral interest purchased by her husband from W. G. Stell on May 16, 1938) . . . . . .1/8th

Lucy Ann and A. G. Stell, Jr., (1/2 of 1/4th from father's succession; plus 1/3rd legitime of 1/4th from grandfather's succession (1/8th plus 1/12th, total) , . , . . . . , . . . .5/24th,' "

6. See footnote 5.

one for the appointment of an under-tutor for her minor children, the other seeking the probate (district) court's authority to accept Elkins's offer. These pleadings and the resulting orders must be read into the deed. The petition for authority set out the ownership of the surface and the minerals of all the parties, and then alleged:

"That one J. B. Elkins, a resident of Webster Parish, Louisiana, has offered to purchase the above described property in fee, subject to existing oil and gas mineral leases, for the sum and price of Four Thousand One Hundred Twenty-Five and No/100 ($4,125.00) Dollars in hand, or $343.75 for the interest belonging to the said minors, with a reservation to the vendors of an undivided three-fourths (¾) of the oil, gas and other minerals, *the one-fourth (¼) mineral interest to be conveyed in the proposed sale to be made up by taking from each of the owners a fractional part of his mineral interest in the proportion that his interest bears to the whole; and that the minors will therefore convey jointly a 5/96 mineral interest."* (Emphasis added.)

The under-tutor, Ardis C. Burns, concurred in Laura's recommendations, and October 9, 1946, the Webster Parish District Court authorized Laura to sell the minors' interest in the property for $343.75, "conveying to the said J. B. Elkins the 1/12 fee interest and 5/96 mineral interest owned by the said minors * * * reserving from the sale to the said minors 5/32nds of the oil, gas and other minerals in, under and that may be produced from said described land, etc."

The crucial provision in the deed of November 6, 1946, is the reservation of ¾ths of the minerals, reading as follows:

"specifically reserving, however, to the vendors herein all delay rentals due or that may become due under existing oil, gas and mineral leases covering said property and further reserving three-fourths (¾) of the oil, gas and other minerals in,

on, under or that may be produced from said land, it being understood and agreed that the one-fourth (¼) mineral interest conveyed hereby is conveyed by each vendor in the proportion his or her mineral interest bears to the whole, the share to be conveyed by each vendor being set out as follows:

W. Garland Stell .......... 1/16
Mrs. Nancy C. Stell ........ 5/48
Mrs. Laura Stell Townsend.. 1/32
Garland Stell and Lucy
    Ann Stell (jointly) ...... 5/96"

Elkins paid $4,125 for the property. Laura received no part of the purchase money, and the minors were paid for their "fee" title only, receiving no payment for their mineral interest.

Elkins, the admitted owner of the land, asserts that the one-fourth mineral servitude created by W. G. May 16, 1938, prescribed ten years later for non-use, the disputed three-sixteenths returning to Elkins as the owner of the land. He interprets the deed as meaning that *each* vendor retained for himself three-fourths of the minerals that he owned before the conveyance, and *each* vendor conveyed one-fourth of the minerals that he owned before the conveyance. He argues that the reservation "to the vendors" of three-fourths of the minerals could not create a new servitude in the defendants except commensurate with their ownership of the land, and that the old 1938 servitude continued in force until by liberative prescription it expired in 1948.

Laura and her children assert their ownership on the theory that the 1946 deed to Elkins (1) was a tacit renunciation by them of the 1938 servitude, (2) thereby merging their one-fourth mineral interest with the land then owned by W. G. (one-half), Nancy (five-twelfths), and the children (one-twelfth) and (3) creating a new servitude by the joint action of *all* the vendors, to run ten years from November 7, 1946, (4) prescription of which was interrupted by drilling and production activities in February 1956.

## III.

The district court found that the deed in itself was sufficient to establish a new servitude in 1946 in favor of the vendors, but admitted extrinsic evidence to determine the intention of the parties, reserving his ruling on the objection to the evidence. Later, on the basis of this evidence [7] and the deed with its supporting documents, the district court found that the understanding of the parties "points unerringly to what was intended and understood to have been accomplished: that there was a renunciation or merger of the old (1938) servitude into the fee ownership, and the creation of a *new* right to the minerals being reserved, which would remain a burden on the land unless lost by non-user after ten years from the date of the 1946 deed." The appellant contends that the district court erred in admitting the extrinsic evidence to contradict the clear terms of the written instrument and erred in the finding as to the parties' intention.

There was no jury that might be beguiled by extrinsic evidence into making meandering excursions to distant places far removed from the jury's destination. It was, therefore, a reasonable, common sense exercise of judicial discretion for the trial judge, crossing his fingers, to give the benefit of the doubt to the proponent of the offered evidence, in order to avoid a remand and retrial and in the interest of determining truth through trial.

## IV.

The appellees rely strongly on the vendors' use of the term "reserving" as manifesting an intention to create a new servitude, arguing that if the defendants had intended to preserve the 1938 servitude they would have made an "exception" for this servitude. The distinction between a "reservation" and an "exception" is an obsolescent, formalistic nicety of common law conveyancing that may hinder as often as it may help a logical and realistic approach to the interpretation of instruments. The Louisiana Court has recognized the distinction; it has also recognized that "the word 'reservation,' * * * [is] often used interchangeably with the word 'exception'." [8] United Gas Public Service Co.

7. The trial judge relied on: (1) the fact that Laura apparently received no pecuniary consideration for conveying her mineral rights; (2) Laura's testimony regarding conversations with Judge Watkins, particularly a long distance telephone conversation, in which he allegedly told her that her interest would continue for ten years after the deed; (3) the testimony of Mrs. Ardis Burns regarding a conversation between Nancy and Judge Watkins about the minors' interests; (4) the conduct of the parties subsequent to the transaction, especially the execution of oil and gas leases in 1953; (5) the notation in Judge Watkins's file stating in skeleton form what the transaction was (presumably) to accomplish. However; (1) even if Laura did not receive money directly, Elkins paid for the interest he received and someone received her share; (2) Laura's self-serving testimony as to her "intent" was based on a long distance telephone conversation with Judge Watkins that took place fourteen years earlier with a person now dead; (3) Mrs. Burns testified that Judge Watkins told the parties that the minors' mineral interests would continue for ten years past their majority, but under cross-examination Mrs. Burns admitted that she had no recollection of any conversation concerning the *adults*, and the questions addressed to Judge Watkins dealt solely with the minors' interest (minority suspension of liberative prescription was abolished by La. Act 510 of 1950, amended La.R.S. of 1950, 9:5805); (4) Elkins testified that in 1953 he was unaware of his legal rights and as soon as he was informed of them he executed a supplemental lease and received payment for the interest in question here; (5) we do not accord Judge Watkins's abbreviated notation the significance the trial judge accords it; under either the plaintiff's or the defendant's theory of the case, the vendors did in fact retain three-fourths; the notation says nothing about the duration of the servitude, the renunciation of the old servitude, or the creation of a new servitude.

8. "Historically, differences existed between a reservation and an exception. According to Lord Coke [no friend of the civil law], an exception saves back part of the

v. Roy, La.App., 1933, 147 So. 705, 708. See also Hodges v. Long-Bell Petroleum Co., 1960, 240 La. 198, 121 So.2d 831.

This is not a case void of any indication as to what the parties meant by the term "reserving". The deed and the supporting tutorship documents which form a part of the conveyance show that the parties themselves used "reserving" in the sense of "excepting" or "retaining". Thus, in the very provision of the 1946 deed on which the defendants rely the vendors state that they are "specifically *reserving, however, to the vendors herein all delay rentals * * * under existing oil, gas and mineral leases*". The petition for authority filed in the tutorship proceeding in effect defines "reserving" as "excepting" by spelling out that the three-fourths reserved is left after "the one-fourth (¼) mineral interest * * * [is] made up *by taking from each* of the owners a fractional part of his mineral in the proportion that his interest bears to the whole". The under-tutor's concurrence eliminates any doubt: the under-tutor approved the petition for authority "after considering the facts that the said deed allows the said minors *to retain a portion* of the minerals owned by them." To the parties, then, "reserving" meant "excepting" or "retaining". Had the parties used the term "reserving" in the sense of creating a new servitude based on the minors' renunciation of their rights the tutor and undertutor would have owed an explanation to the Webster Parish District Court and a showing that a renunciation of rights was to the advantage of the minors.

## V.

Whether the evidence was or was not admissible, whether the intention of the parties was or was not as the trial judge found it, under Louisiana law the vendors did not create a new servitude by the method they contend they used in this case.

Unquestionably, language of "reservation" suffices to create a servitude. This is elementary and undisputed. Long-Bell Petroleum Co. v. Tritico, 1949, 216 La. 426, 43 So.2d 782; Long-Bell Lumber Co. v. Granger, 1953, 222 La. 670, 63 So.2d 420. But in Louisiana a landowner has the exclusive right to create a new mineral servitude (to the extent that he owns mineral rights commensurate with his land); the owner of a mineral interest only is powerless to do so. Long-Bell Petroleum Co. v. Tritico, 1949, 216 La. 426, 43 So.2d 782; Hanby v. Texas Co., 140 La. 189, 72 So. 933; De Moss v. Sample, 143 La. 243, 78 So. 482; Wemple v. Nabors Oil & Gas Co., 154 La. 483, 97 So. 666.

The 1938 servitude was à mineral interest only, so that Laura and the minors, having no land, were powerless to create a new servitude for their requisite share (1/16). The minors did inherit one-twelfth (8/96) of the land and minerals from their grandfather. If their mineral "reservation" of three-fourths of 8/96 were given the effect of creating a new servitude it would preserve only 6/96 to the minors and convey only 2/96 to Elkins; the deed purports to convey, however, 5/96.

For the parties to have created a new servitude it was necessary for one of two things to have occurred: either (1) the landowners, who owned three-fourths of the minerals, created a new servitude and reserved it in favor of themselves and in favor of the defendants by *stipulation*

---

thing being granted; to be excepted the thing must be in esse. A reservation creates a new right, a thing not in esse. In theory, a reservation was a regrant, from grantee to grantor. From this premise it accordingly followed that an exception did not require words of inheritance to create a fee or inheritable interest, but a reservation did require such words of art. In modern law this distinction is meaningless in most cases,

because statutes dispense with the need for words of inheritance in deeds and further because the courts will read 'exception' and 'reservation' interchangeably. * * * Modern construction practice requires judges to abandon such formalistic rules and to interpret instruments from the four corners to arrive, as well as may be, at the intention of the parties." Williams and Meyers' Oil and Gas Law (1959) § 310, p. 557.

*pour autrui;* or (2) Laura and the minors renounced their 1938 servitude, which returned to the landowners and was extinguished by confusion, the landowners re-conveying a new servitude to Laura and the minors, who in turn sold one-fourth of their new mineral servitude to Elkins. Neither of these conclusions is legally acceptable.

The first possibility may be dealt with briefly. We cannot say that the vendors created a new servitude and reserved it in favor of themselves, in the nature of a *stipulation pour autrui* for the defendants, since that directly contradicts the express language of the deed itself. The deed states that the minerals conveyed to Elkins are "conveyed *by each vendor* in the proportion his or her mineral interest bears to the whole", and the deed lists the exact proportion of minerals that *each* vendor conveyed. There is no language evidencing any intent on the part of the vendors to confer a benefit on the defendants; on the contrary, on the face of the instrument the vendors are on a proportionately equal basis, each retaining exactly three-fourths of his mineral interest. The landowning Stells were *the only persons who could create a new servitude,* but they could do so only to the extent of their ownership of the land and minerals; their reservation of ¾ could create a servitude of only ¾ of ¾. Thus the real question is whether Laura and the two minors renounced their 1938 servitude, causing that mineral interest to revert to the landowners at the time of renunciation.

The decision below is based on the holding that Laura and her children tacitly renounced their servitude. The district court said: "Moreover, we think it was clearly the intention of the parties, in executing the deed, *although not expressly declared,* that in order to effectuate the transaction as agreed, *necessarily* Mrs. Townsend [Laura] and her children tacitly renounced the 1938 servitude." [182 F.Supp. 876.] (Emphasis supplied.) The appellees contend that the defendants, by joining with W. G. and Nancy Stell in conveying all of the land and one-fourth of the mineral rights *with warranty of title,* must have intended giving up their servitude. Two mineral estates would then be created, the one-fourth mineral estate in Elkins and the three-fourths mineral servitude reserved to the vendors. Since these two new mineral estates aggregate the entire estate, so the argument runs, such action on the part of the servitude owners necessarily presupposes the "annihilation" of any prior rights they held, because only landowners may create new servitudes. In accordance with this theory the vendors collectively sold the land and one-fourth of the minerals, collectively warranted title, and collectively reserved the new servitude amounting to three-fourths. In other words, once the intention is found to create a new servitude a tacit renunciation of the 1938 servitude must be inferred—because, unless the 1946 deed "annihilated" the 1938 servitude the conveyance could not create a new servitude. This question-begging reasoning apparently assumes that a tacit renunciation may arise simply by implication, without regard to the limitations established in Articles 819 and 820. This is not the sort of annihilation Articles 819 and 820 contemplate. And no such renunciation, express or tacit, has ever been recognized in the Louisiana courts.

The juristic accomplishment of fitting oil and gas transactions into the codal law of praedial servitudes is a tour de force illustrative of the theory of the Code as a compilation of principles, not a digest of specific laws. As with many similar tours de force, although the result as a whole is in keeping with civilian concepts, some specific results are far from perfect. We recognize, therefore, that courts should not expect a perfect fit in cloaking a mineral servitude (the right to explore for oil and gas) with ancient laws designed for such servitudes as the right of passage. Louisiana courts have utilized this latitude to make logical extensions of the scope of the servitude doctrine, if such extensions are in keeping with the principle underlying the doc-

trine.[9] But courts have no license to ignore the spirit of the law or to circumvent the underlying principle as established by the Code.

First, we go to the Code—the fountainhead. The Louisiana Civil Code provides that servitudes may be extinguished by renunciation, that is, by the voluntary relinquishment or release of the servitude by its owner. "[Such] renunciation or release may be express or tacit." Art. 816; Art. 783.

Article 817 of the Code provides:

"The express release must be made *in writing,* and is confined to what is *clearly expressed* in the act containing it, because *one is not easily presumed to have renounced his right.* Besides, the owner who makes the release must be capable of disposing of immovables; this release of a servitude being a real alienation."

The deed and the tutorship proceeding are silent on the question of renunciation. There was, therefore, no "clearly expressed" renunciation of the servitude as required by Article 817.

Article 819, in terms, restricts tacit renunciation to the situation when the owner of the servitude permits the owner of the subservient estate "to build on it such works" as "prevent the exercise of the servitude." The article reads:

"The release of the servitude is tacit, *when the owner of the estate to which it is due permits the owner of the estate charged with the servitude,* to build on it such works as presuppose the annihilation of the right, because they prevent the exercise of it; for example, if he should permit the field, through which he has a right to pass, to be closed by a wall."

A logical extension of this principle would permit the application of the article, in oil and gas cases, to other than physical obstructions. Delahoussaye v. Judice, 1858, 13 La.Ann. 587. But it seems clear that the tacit release Article 819 contemplates is an obstruction for which the owners of the subservient estate—here the landowners—are responsible. The landowning Stells have not obstructed the exercise of the 1938 servitude, much less made it impossible for the servitude to be exercised. Before May 16, 1948, a court would have been compelled to hold that Laura and her children had exclusive and unimpaired ownership of the 1938 servitude. They would have continued to own this servitude indefinitely, if the oil found in 1956 had been found before May 16, 1948. Whatever inconsistency, if any, existed between the vendors' intent, as found by the trial court, and the continued existence of the 1938 servitude was brought about by the owners of the servitude [10]— not the owners of the burdened estate who did nothing and could do nothing (in this case) to terminate the servitude. Articles 819 and 820 do not contemplate

---

9. Portalis made this clear in discussing the philosophy of the Code Napoleon: "L'office de la loi est de fixer, par de grandes vues, les maximes générales du troit; d'établir des principes féconds en conséquences, et non de descendre dans le détail des questions qui peuvent naitre sur chaque matière. *C'est au magistrat et au jurisconsulte, penetres de l'esprit général des lois,* à *en diriger l'application.* * * * Il y a une science pour les legislateurs, il y en a une pour les magistrats; et l'une ne ressemble pas à l'autre. La science du legislateur consiste à trouver dans chaque matière, les plus favorables au droit commun: *la science du magistrat est de mettre ces principes en action, de les ramifier, de les étendre par une application sage*

*et raisonnée, aux hypothèses privées."* Portalis, Discours Préliminaire, reproduced in Fenet, Recueil complet des travaux préparatoires du Code Civil, Vol. 1, 470, 475.

10. Thus, the trial court found: "When the servitude owners not only permitted but actively joined in the creation of new mineral estates which, when taken together, aggregate the entire estate, such action on their part presupposes the annihilation of any prior rights they held. Necessarily, no land-owner can enjoy a greater right to the minerals thereunder than *all*—the entirety—and when that estate is so divided that one acquires the right to one-fourth of the minerals, and a group collectively acquires

a tacit renunciation brought about by the servitude owner; there is no reason for it. The servitude owner can, if he wishes, simply make an express renunciation under Article 817, provided that it is "clearly expressed".

Article 820 reads:

"In order that the tacit release of the servitude be inferred from the permission which the owner of the estate to which it is due has given for the erection of works which prevent the exercise of it, it is necessary:

"1. That the permission or consent for the erection of these works should be given expressly, verbally or in writing. From the mere sufferance of works contrary to the servitude, the release can not be presumed, unless it has continued for a time necessary to establish prescription.

"2. That the works thus constructed be of a permanent and solid kind, such as an edifice or walls, and that they present an absolute obstacle to every kind of exercise of the servitude."

This article, a corollary to Article 817's injunction against presuming renunciation, shows that a *tacit* release of a servitude is not to be lightly inferred. It is limited severely, arising only in certain circumstances and not every time the inference of a renunciation may be drawn. Although a release may be tacit, permission for the act that prevents the exercise of the servitude must be "given *expressly*, verbally or in writing". A release cannot be grounded upon implication. Even undisputed evidence of the "sufferance of works contrary to the servitude", is not enough—"unless it has continued for a time necessary to establish prescription". Finally, the "works" on which the renunciation is predicated, must "present an absolute obstacle to ev-

ery kind of exercise of the servitude." That is not the situation here.

The legal protection surrounding minors and the necessity for strict compliance with the law when a minor disposes of any rights raise an obstacle to the theory of tacit renunciation that the appellees gloss over lightly. An express renunciation may be made only by persons "capable of disposing of immovables." Art. 817. Under Louisiana law minors are incapable of disposing of immovables except by representation of their tutor and upon authorization by the court.[11] The Stell minors were incapable of expressly renouncing their servitude without authorization of court. *A fortiori,* they could not tacitly renounce without authorization, disregarding, for the moment, the contradiction in terms.

Since there is no mention of "renunciation or voluntary release" in the tutorship proceedings and no indication in the pleadings or orders that the question of renunciation was presented to the Webster Parish District Court, the appellees find themselves in the untenable position of asserting that Judge Watkins, described by the trial judge as "an able and experienced attorney, well versed in Louisiana law", petitioned the court for approval of a *tacit* renunciation when he might just as easily have asked, and should have asked, for approval of an express renunciation. And, to justify the judgment below, the trial judge here had to find that the Webster Parish District Court knowingly issued an unheard-of and self-contradictory order approving a *tacit* renunciation. Appellees say that the 1946 deed was to the advantage of the minors, because they exchanged a servitude expiring in 1948 for a smaller interest expiring in 1956. This alleged advantage does not appear on the face of the papers. The argument for it ignores the necessity for an explanation to the Webster Parish Court and the resultant obligation that would arise from

the other three-fourths, as here, if prior to that division, one or the other of the parties had owned a separate and distinct right to a part of the minerals, such prior

right *ex necessitate* is extinguished; otherwise, the partition is ineffective."

11. LSA–Civil Code, Articles 339–345.

the need to protect the minors' interest in the rearrangement of mineral ownership, supposedly to take place but never mentioned in the proceedings. Rearrangement of the division of ownership, no small matter, is not discussed by the district judge or the appellees. There is no evidence whatever that the vendors to whom the renounced servitude would revert intended to rearrange ownership, much less how it would be rearranged and the minors protected. The court's order authorizes the children to convey a fractional part (5/96) and to reserve the remaining part (15/96), or exactly three-fourths of their mineral interest. The order agrees with the petition for authorization stating that the interest to be conveyed would be made up "by taking from each of the owners a fractional part of his mineral interest. * * *" It agrees also with the undertutor's concurrence stating that the deed "allows the said minors to retain a portion of the minerals owned by them." In short, there is no authorization by the Probate Court, on the sole authority of which this contract was executed, for the minors to renounce their mineral servitude interests, expressly or tacitly. Without such approval, the children were incapable of renouncing their servitudes.

There is still more grit in the oil, so far as tacit renunciation by the minors is concerned. At the time of the November 6, 1946 deed, the minors owned 1/12 of the land and 20/96 of the minerals. Their servitude, which had less than two years to run, constituted 12/96 of the whole; their land and mineral interest inherited from their grandfather totaled 8/96. They conveyed all of the land they owned, but they conveyed merely one-fourth of their minerals, or 5/96. Since 8/96 of the ownership minerals would run indefinitely or, if the land were sold, would run for ten years, and this 8/96 exceeded the 5/96 interest they conveyed, it was thus not necessary for the minors to renounce tacitly at all. There is, of course, no way of knowing from which interest the minors conveyed the 5/96 to Elkins. That is unspecified in the deed or the probate proceedings. If they conveyed the 5/96 as part of the 12/96 1938 servitude, then their 7/96 prescribed in 1948; if they conveyed the 5/96 from the inherited 8/96, their 3/96 had ten years to run, and 12/96 prescribed in 1948; if they conveyed half from each, then 19/192 prescribed in 1948.

In the interest of protecting minors, consistently with the law, we hold that the minors conveyed their one-fourth (5/96) to Elkins from the 1938 servitude, retaining 7/96 of that servitude, and establishing a new servitude for 8/96, the extent they were legally capable of establishing because of their 8/96 ownership of the land. So far as Laura is concerned, the deed did not create a new servitude, renounce the old servitude, or interrupt prescription already running. She merely shaved off one-fourth from the top of the mineral interest she already owned, retaining three-fourths. Consequently her share of the 1938 servitude, or what was left of it, prescribed May 16, 1948 and, reverted to Elkins, the landowner,—whether or not he knew of it at the time and whether or not it was a windfall.

VI.

The result we reach is consonant with the Louisiana decisions in the field. In the important case, Long-Bell Petroleum Co. v. Tritico, 1949, 216 La. 426, 43 So.2d 782, the landowner and the mineral servitude owner joined together in the execution of a deed to the land containing an express reservation of the minerals. In its original opinion the Louisiana Supreme Court recognized that the parties intended to interrupt liberative prescription, which had run for almost ten years, yet, on rehearing, the court held the deed ineffective to accomplish this purpose. Long-Bell Lumber Company owned all the lands involved before their sale to Tritico's ancestors in title. In 1932 Long-Bell Lumber Company conveyed to Long-Bell Petroleum Company a full mineral servitude covering the subject tract and a large contiguous area, comprising several thou-

sand acres, thereby creating a single servitude on the entire area. In 1941, forty-five days before the 1931 servitude would prescribe, at a time when the Lumber Company owned all the land and the Petroleum Company owned all the minerals, the two companies joined together as vendors to convey the lands to Tritico's ancestor in title. The act of sale "reserved" to Petroleum Company all the minerals under the subject tract. The Louisiana Supreme Court observed that the Petroleum Company appeared as one of the vendors for protective purposes only, rather than to establish a new right, and concluded that the parties did not intend to create a new servitude. But the court also held that even if the parties had intended to create a new servitude the attempted reservation to the Petroleum Company was ineffective either to establish a new servitude or to extend the old one, because the Lumber Company, the landowner, was powerless to create a new servitude so long as the old one was outstanding, and Petroleum Company (owning no land) was incapable of creating a new servitude. Because the 1931 servitude covered a large contiguous area, of which the Tritico lands were only a small part, the court also concluded that Petroleum Company did not intend to renounce or relinquish the servitude it owned, as that would cause it to lose the servitude on the larger area as well.

There are points of distinction between the Tritico case and the case at bar, as the trial judge aptly pointed out. There were protective covenants in favor of the vendee in the Tritico deed, but there are none here. The servitude in Tritico covered additional lands, but the servitude here covers only the subject tract. The landowner owned no minerals, and the mineral owners owned no land, in Tritico, but here the landowners also owned some minerals and could have created a new servitude. The principles of the case, however, are controlling,[12] and we are not at liberty to ignore the holding that the Code requires a clear expression of the intent to renounce:

"In order to accomplish the release of a mineral servitude by its renunciation, the release must be in writing and clearly express such intention, (Louisiana Civil Code) Art. 817 * * *. There is nothing in the deeds which clearly expresses an intention to renounce; and the Petroleum Company, not having clearly expressed in the acts its intention to renounce the servitude, we are unauthorized to presume that it intended to do so." 43 So.2d at 792.

Subsequent to Tritico, the Louisiana Supreme Court decided Long-Bell Lumber Co. v. Granger, 1952, 222 La. 670, 63 So.2d 420, 422, 423, involving a mineral reservation in identical language to that contained in Tritico. The deed in Granger was not executed until 1943, two years after the 1931 servitude referred to in Tritico had prescribed for non-use. Thus, when the Lumber Company and the Petroleum Company joined as vendors in executing the deed to Granger, the Lumber Company owned all the land and all the minerals, and the Petroleum Company owned no interest of any kind. The Court held that the reservation of all the minerals in favor of the Petroleum Company (which actually had nothing to "reserve") constituted a stipulation pour autrui, validly creating a new mineral servitude in favor of Petroleum Company. Holding that the lan-

---

12. Nabors writes: "A convincing example of the futility of a vendor's employment of reservation phraseology for the purpose of renewing an outstanding mineral servitude is furnished by the recent case of Long-Bell Petroleum Co. v. Tritico in which the vendor corporation and its subsidiary corporation which was the mineral-servitude owner joined in the execution of a deed to the land which contained an express reservation of the minerals. Despite the obvious intention to interrupt liberative prescription which had run for almost ten years, noncompliance with the technical formality of acknowledging the existing mineral servitude resulted in the loss of the mineral rights." Nabors, Report on Louisiana Mineral Law, 25 Tul.L.Rev. 303, 310 (1951).

guage of "reservation" sufficed to create a new mineral servitude, the court explained its decision in Tritico: "But from a careful reading of the majority opinion on rehearing in the Tritico matter it clearly appears that the reservation * * * was so held to be ineffective [to create a new servitude] because, and solely because, those deeds were executed within ten years from the date of the original servitude of December 29, 1931 (different from the 1943 deeds here), at which time the vendor, Farm Land Corporation *had no minerals to reserve.*" The *stipulation pour autrui* rationale accepted by the Louisiana Supreme Court in Granger fits the facts of that case. There is nothing in the Granger case to justify the district court's holding in this case that the parties, by virtue of the reservation, re-arranged the mineral ownership among themselves and W. G. and Nancy then made Laura and the two minors third-party beneficiaries of a *stipulation pour autrui*. There was no kind of "re-arrangement" of interests in the Granger case, and the *stipulation* was clear and express. Here, there is no clearly expressed stipulation and no language to justify finding a "re-arrangement" of interests (from whom and to whom). Again, as with the argument for a tacit renunciation, if a re-arrangement had been intended, the parties could easily have spelled it out and incorporated it in the document instead of leaving the matter open to speculation requiring interpolation and inferences from conflicting implications. Assuming a re-arrangement to have been intended, *how* was it accomplished? The answer can only be: by tacit renunciation causing the servitudes to revert to the landowners. Yet we have already seen that this theory of tacit renunciation does violence to Louisiana codal and decisional law.

The defendants argue that the warranty of title included in the November 6, 1946 deed establishes a new title by estoppel in themselves. They rely upon Hodges v. Long-Bell Petroleum Company, 1960, 240 La. 198, 121 So.2d 831, 840, decided after the decision of this case in the lower court. Such reliance, we believe, is misconceived. In that case the plaintiff, Hodges, acquired title to a tract of land in 1938. The conveyance contained a "reservation" of mineral rights in favor of the Petroleum Company which actually owned no interest in the land other than the mineral servitude created in 1931, covering a large area of land that included the tract conveyed to Hodges. The 1938 conveyance contained a warranty of title, but did not mention the 1931 mineral servitude. More than ten years after the 1938 conveyance, Hodges sought a declaratory judgment declaring him the owner of the mineral rights by liberative prescription. The defendant vendors contended that the 1931 servitude had not prescribed but was kept alive by drilling operations on land *other* than that conveyed to Hodges. The Louisiana Supreme Court held that the defendant vendors were estopped by their warranty of title from asserting any rights under the 1931 servitude which were more extensive than the rights they had attempted to reserve in the 1938 conveyance. The court reasoned that a mineral servitude constitutes a charge upon the land, and the warrantor warrants the land to be free of all charges not declared in the deed. Since Petroleum Company did not declare to Hodges the existence of the 1931 servitude, it was estopped to claim any mineral rights in the property arising from that servitude which would constitute *a more onerous charge* upon the land than the servitude contracted for. The court took cognizance of the fact that Hodges contracted for the establishment of a mineral servitude on his land, and thus he too was estopped from asserting a claim contrary to his contract. Holding that the deed created no new servitude but allowed the 1931 servitude to remain a charge upon the land, the court stated: "[A]t least for the ten years that ensued following Hodges' purchase, he, as vendee, was precluded by his bargain from invoking an estoppel against Petroleum Company in an attempt to prevent it from claiming under *any valid ser-*

*vitude* in its favor which existed on Hodges' land during that time." (Emphasis supplied.) As we read the Hodges decision, applying it to the present case, Laura and the two minors were not estopped from asserting the 1938 servitude —in spite of their warranty and the failure to mention the servitude by name —so long as the 1938 servitude was "valid." And, similarly, Elkins was estopped from invoking estoppel (because of their warranty) against them with respect to the 1938 servitude. As the Louisiana Supreme Court said, this "would appear to be in keeping with equity and common justice." 121 So.2d at 840. This is a sound, fair result, in keeping with the Hodges decision. On the other hand, it is an unwarranted extension of the Hodges decision to contend, as the appellees do, that they are entitled to a far more onerous charge (a new servitude) upon the land because they failed to declare a less onerous charge (the old servitude). That result comports with neither fairness nor common sense. See 35 Tul.L.Rev. 259 (1960).

The Louisiana Supreme Court, in discussing these cases, has pointed out that there must be "the clearly expressed intention on the part of the servitude owners necessary under Article 817 of the Civil Code and Long-Bell Petroleum Co., Inc., v. Tritico, supra, for the renunciation of the servitudes which were in existence". Bourg v. Hebert, 1954, 224 La. 535, 70 So.2d 116, 120. This principle is consistent with the strong public policy of the state that the right to explore for oil and gas reverts to the land after ten years non-use. Hicks v. Clark, 1954, 225 La. 133, 72 So.2d 322, 323. It is true that the Supreme Court has intimated that a new servitude might be re-created by a renunciation followed by a new reservation, but the court has never allowed it to be done. Thus far, the Court has required the renunciation to meet the strict test of Article 817 requiring that the release be "clearly expressed in the act containing it"; and not the tacit renunciation test of Articles 819 and 820, although Article 820 also imposes severe requirements.

In summary, we hold that the defendants in the November 6, 1946 deed conveyed to Elkins a portion of their then mineral interests and retained a portion of that interest for themselves. The Court is well aware that Laura might have made an express renunciation and that, on a properly drawn petition for authority, the Webster Parish District Court might have authorized the minors to renounce their mineral interests. We do not decide what the parties might have done. We decide what the parties did. The judgment of the lower court is hereby reversed and the case remanded for disposition not inconsistent with this opinion.[13]

Reversed and Remanded.

CAMERON, Circuit Judge, concurs in the result.

13. As we compute it, in 1946:

Laura owned 1/8 minerals, sold 1/32, retained 3/32

Minors owned 20/96 minerals, sold 5/96, retained 15/96 (7/96 from 1938 servitude; 8/96 from new servitude)

And in 1948, when the 1938 servitude prescribed:

Laura lost 3/32 = 18/192
Minors lost 7/96 = 14/192
Total        32/192, or 1/6

Thus:

Elkins acquires this 1/6
Minors still have 8/96 or 1/12
Laura has nothing.

Of the original 1/4, or 24/96, 1938 servitude:

Laura conveyed 3/96 in 1946
Minors conveyed 5/96 in 1946
Leaving 16/96 outstanding.

In 1948, the remaining 16/96 prescribed:

Laura lost 3/32, or 9/96
Minors lost 7/96.